
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 75060-7-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| MARQUE DEANDRE FLUKER, | ) | |
| | ) | PUBLISHED OPINION |
| Appellant, | ) | |
| | ) | |
| JERRY ALLEN FLUKER, | ) | |
| | ) | |
| Defendant. | ) | FILED: September 4, 2018 |

SCHINDLER, J. — Mar'Que Deandre Fluker shot and killed LeMaun Lancaster. The State charged Fluker with intentional murder in the second degree while armed with a firearm. The jury rejected his claim of self-defense and convicted Fluker of the lesser included crime of manslaughter in the first degree while armed with a firearm. Fluker seeks reversal. Fluker contends (1) the court violated his right to present a defense by excluding evidence that he had a permit to carry the gun and (2) the court erred by refusing to instruct the jury on manslaughter in the second degree. Because the court did not abuse its discretion by excluding the evidence and ruling the evidence did not support instructing the jury on manslaughter in the second degree, we affirm.

## FACTS

King County Sheriff Deputy Matthew Paul responded to reports of a shooting in the parking lot at 68th Avenue South and Renton Avenue South at approximately 7:41 p.m. on August 12, 2015. Deputy Paul saw a black man, later identified as LeMaun Lancaster, on the ground surrounded by people "providing first aid." Lancaster "had several gunshot wounds to his body." Lancaster had been shot 8 to 10 times in the chest, abdomen, back, legs, arm, and hand.

While Deputy Paul put pressure on the wounds, he asked Lancaster, "[D]o you know who shot you." In response, Lancaster "kept saying Mar'Que repeatedly."

While waiting for medics, Detective Aaron Thompson helped apply pressure to the wounds in the left upper chest area. Lancaster was having "difficulty breathing" and was "in and out of consciousness." Detective Thompson asked Lancaster "if he could tell me who shot him." Lancaster told Detective Thompson "Mar'Que Fluker" shot him.

Lancaster died in the ambulance on the way to Harborview Medical Center.

Deputy Paul interviewed witnesses. Detective Chris Johnson collected 9 mm bullet casings from the parking lot where Lancaster was shot. Detective Thien Do obtained surveillance videos from Ezell's Famous Chicken and a marijuana dispensary, GHL. The police later watched the surveillance videos.

The surveillance video from Ezell's Famous Chicken and GHL show what happened leading up to the shooting and the shooting.

Lancaster, Jalen Coleman-Roy, and Joseph "Tank" Davison are talking while standing together in front of Ezell's and GHL. Lancaster is wearing a white T-shirt and grey sweatpants; Coleman-Roy is wearing a black sweatshirt, gray sweatpants, and red shoes; and Davison is wearing a white T-shirt, dark shorts, white shoes, and a red hat. Mar'Que Deandre Fluker, his older brother Jerry Allen Fluker, and their nephew Jayvon "Bubba" Grayson drive into the parking lot near Ezell's in a silver Chevrolet Impala. Mar'Que is wearing a Seattle Seahawks jersey with the number 24; Jerry is wearing a Portland Trailblazers jersey, black pants, and a red hat; and Grayson is wearing a green shirt and a green and blue stocking cap.[1] The two groups stand near the curb, talking. Lancaster tries to give a flyer to Grayson. Grayson pushes Lancaster's hand away and they gesture to each other.



---

[1] For purposes of clarity, we refer to Mar'Que Fluker and Jerry Fluker by their first names.

3

Lancaster punches Grayson. Lancaster and Grayson then posture and throw punches for several minutes. After the fight moves into the parking lot, Coleman-Roy and Mar'Que intervene and separate Lancaster and Grayson. Coleman-Roy pushes Grayson toward the Impala. Mar'Que and Davison push Lancaster in the opposite direction.



Jerry then approaches Lancaster and pushes him in the chest. Lancaster punches Jerry in the face, knocking off his hat. Mar'Que has his hands at his waist. Davison is standing with his hands behind his back.



4

Mar'Que removes a gun from his pants and walks toward Lancaster. As Lancaster backs away, Mar'Que raises his left arm and points the gun at Lancaster with his right arm extended.






Mar'Que shoots Lancaster at least eight times. Lancaster doubles over, twists away from Mar'Que, and falls to the ground. Davison (Tank) backs away, turns, and runs away in the opposite direction.







As Lancaster falls to the ground, Jerry picks his hat up off the ground and Mar'Que walks away. Jerry walks to the Impala and gets in the driver seat. Mar'Que puts the gun back in his pants and paces back and forth.





Mar'Que and Grayson get in the car. Coleman-Roy runs to help Lancaster. As Jerry backs out of the parking space, Mar'Que jumps out of the car.



Mar'Que walks toward Lancaster but then turns back, talks to someone in the Impala, and then gets in the back seat of the car. Jerry drives away.



The State charged Mar'Que Fluker with intentional murder in the second degree while armed with a firearm and charged Jerry Fluker with felony rendering criminal assistance in the first degree. Jerry pleaded not guilty. Mar'Que asserted self-defense and defense of others.

The State called over 20 witnesses to testify during the two-week jury trial. The court admitted into evidence a number of exhibits, including an exhibit with the surveillance video from Ezell's and GHL and 872 still photographs of the events leading up to the shooting and the shooting, exhibit 21.

Emergency medical technician Steven Anderson testified he "noticed a group of gentlemen across the parking lot hanging out." Anderson was "about 50 yards" away and "couldn't tell if they were arguing or if they were fighting. It appeared to me that it was a group of friends kind of throwing fake punches at each other." Anderson heard the voices "get louder" and "one person, you know, hit one person, hit the other person, and then vice versa." Anderson testified that the group of men "kind of converged on each other to try to separate the two that were fighting, and that's when one of them pulled out a gun." Anderson testified, "Someone started shooting." Anderson said the group "somewhat dispersed, it backed up, and then somebody had said, you know, why would you pull out a gun." After the shooter "got into the car" and drove away, Anderson went "over to where the kid that was shot was on the ground." There were "multiple bullet wounds in him." While waiting for the medics to arrive, Anderson applied pressure to some of the wounds.

Coleman-Roy testified he was friends with Lancaster and Mar'Que since high school and considered Grayson "like my little brother."

The State played the exhibit with the surveillance video during the testimony of Coleman-Roy, and he described what happened. Coleman-Roy testified that Lancaster was passing out flyers for a "rapper coming to town" and tried to give a flyer to Grayson, but he pushed it away. Grayson started "trash-talking" and said the "rapper is weak." At first, Lancaster and Grayson "were just trash-talking to each other, just joking around with each other how friends do." But then "they got face to face, and that's when it escalated and the fight broke out." After Grayson "kept antagonizing" Lancaster, Lancaster punched Grayson, and Grayson "defended himself."

Coleman-Roy said Lancaster and Grayson fought for several minutes before he and Mar'Que intervened. Coleman-Roy testified that "[o]nce they started fighting, our first instinct was to break it up." But no one immediately intervened. After "[t]he situation was only escalating more and more between" Grayson and Lancaster, "we started to break it up." Coleman-Roy grabbed Grayson and Mar'Que grabbed Lancaster. Coleman-Roy said Jerry "was just kind of standing off to the side" and "paying no attention" to Lancaster and Grayson.

Coleman-Roy pushed Grayson toward Jerry's silver Impala that was parked nearby. As Grayson "started to get in the car," he "started pointing over [Coleman-Roy's] shoulder." As Coleman-Roy turned around to see what

10

Grayson was pointing at, he heard gunshots and saw Lancaster fall "to the ground."

Coleman-Roy said Davison "was just standing there" and never intervened. "He was scared the whole time . . . to get involved." Coleman-Roy did not hear "anybody say anything about a gun" before hearing the gunshots. Coleman-Roy did not see anyone with a gun except Mar'Que. Coleman-Roy stayed with Lancaster and called 911.

King County medical examiner Dr. Desiree Marshall testified about the "15 actual gunshot wounds" in Lancaster's left upper chest, left abdomen, left back, mid-lower back, left thigh, right leg/knee, left forearm, and left hand and a "graze" to Lancaster's right upper chest. Dr. Marshall recovered bullet fragments "from his left hip bone." Dr. Marshall testified the "minimum number" of "total separate gunshots" "would be eight" and the "highest would be ten."

Washington State Patrol Crime Laboratory firearm examiner Kathy Geil analyzed the "several cartridge cases" and the "fired bullet" recovered from the parking lot. Geil testified the cartridges and bullet "were 9 millimeter caliber" and "had all been fired from the same firearm." Geil testified that rounds fired from a semiautomatic gun are fired "as fast as you can pull the trigger."

Mar'Que Fluker, Bruce Johnson, and Jerry Fluker testified on behalf of the defense. Mar'Que testified he and Lancaster "grew up in the same neighborhood" and had been friends since middle school. The court admitted a recent cell phone video of Mar'Que and Lancaster "in the car rapping" together. The defense played the video for the jury.

Mar'Que testified that when he arrived at the parking lot on August 12, he gave Lancaster "a handshake, like a little hug at the same time." Mar'Que said Lancaster asked whether Mar'Que had his "new gun." Mar'Que said Lancaster knew "that I had bought a new gun and stuff, and he asked me if I had it, and I was like yeah, I was like, where's yours? He's like my shooter got it, my friend Tank."

Mar'Que said everyone was "getting along" until his nephew Grayson and Lancaster started "disputing about the rapper and stuff like that." Lancaster hit Grayson and they started "scuffling." After they stopped fighting, Mar'Que grabbed Lancaster and pushed him away. But Mar'Que said Lancaster and Grayson were "still trying to get at each other" and the fight moved "out to the parking lot." Mar'Que testified, "I'm grabbing [Lancaster] and pushing him away because he's saying more stuff that's, you know, more crazy like I kill you with my bare hands, talking to [Grayson]." Mar'Que told Lancaster, "I'm like, that's what you're not going to do, you know." Mar'Que testified, "I'm just pushing [Lancaster] away, because things is just getting too out of hand now," and, "I guess he starts getting mad at me because I tell him, that's not what you're going to do, you know, like defending my nephew, whatever, and then just keep on pushing him."

Mar'Que admitted he did not see Lancaster with a gun. But according to Mar'Que, Lancaster was "telling Tank to go grab his gun. . . . He was cussing and stuff, just like go get my shit, you know, and just cussing and saying what he's going to do to us and whatnot." Mar'Que testified that he was "afraid."

Mar'Que said Lancaster acted "like that" at a party "a couple weeks before" when he "pulled the gun out . . . on one of our friends." Mar'Que said he was able to eventually "calm [Lancaster] down that time." Mar'Que said that on August 12, he was "trying to calm [Lancaster] down because I didn't want things to get that far."

Mar'Que testified that while he was pushing Lancaster away from Grayson, Lancaster "said that, you know, he'd kill us with his bare hands," and he would take "my gun" and "use it on me."

Mar'Que testified his older brother Jerry "grabbed [Lancaster], like just chill out, you know," and then Lancaster "pushed my brother." When Lancaster punched Jerry, Mar'Que pulled out his gun and shot Lancaster. Mar'Que said he was not trying to kill Lancaster, just "stop him."

> Q   Did you shoot him?
> A   Yes. After he socked my brother.
> Q   And were you trying to kill him?
> A   No.
> Q   What were you trying to do?
> A   Just trying to stop him.
> Q   Did it happen — how fast did it happen?
> A   It happened so fast, like a blink of an eye.
> Q   Okay. What did you do when you shot him?
> A   Um, well, when he had punched my brother, he had said, shoot him; that's why I reacted, because when he socked my brother, he said, shoot him, so I thought, you know, you know, me and my brother is going to get shot.

The prosecutor played the video during the cross-examination of Mar'Que. Mar'Que testified that Lancaster threatened to kill him with his "bare hands" and told Davison to go get his gun.

> [W]hen I first started pushing him away from everybody else, that's when he first started saying, I'll kill you with my bare hands, and

that's when I'm like, no, you're not. And I'm still pushing him away.
And he said, well, I'll take your gun from you and use it on you.
And then I'm like, you know, you got me fucked up; you're not going
to take nothing from me, you know, and that's when he start saying
— he's saying, go get my shit to Tank, and then we started walking
off still, and he says it another time.

But Mar'Que admitted Lancaster did not try to get Mar'Que's gun away from him.

Q   . . . Are we going . . . to see [Lancaster] go for your gun?
A   No.

Mar'Que testified that while he was trying to calm down Lancaster, he

"wasn't concerned" about Davison. The video shows that at the point Mar'Que

said Lancaster told Davison to "go get" a gun, Davison remains standing with his

hands behind his back and does not have a gun.

Mar'Que testified that when he was pushing Lancaster away from

Grayson, he was "not concerned" that Lancaster was going to kill anyone, but

"[t]he way [Lancaster] was talking made me concerned about what was going to

happen next." Mar'Que testified that he decided to pull out his gun and shoot

Lancaster "[w]hen he socked my brother and said, shoot him."

Q   Well, you knew [Lancaster] didn't have a gun in his hand?
A   Not in his hand.
Q   Right. And you shot him anyway?
A   To stop him.

Mar'Que admitted he did not fire the gun "accidentally."

Q   And that day this gun that you had, it didn't go off accidentally,
correct?
A   Did it go off accidentally? No.

Mar'Que testified he had to "intentionally" pull the trigger each time he fired a shot at Lancaster.

> Q    You intentionally pulled the trigger?
> A    Yeah, to stop him.  That was my intentions, to stop him from doing anything else.
> Q    And you intentionally pulled the trigger more than once?
> A    It happened so fast.  I know it was more than once but — it was more than once.

But Mar'Que did not remember how many times he shot Lancaster.  "It was just like adrenaline.  I don't remember.  It just happened so fast."

Mar'Que testified that after he shot Lancaster, he wanted to stay but his brother convinced him to leave.

Bruce Johnson operates a mobile automobile detail business out of the parking lot near Ezell's.  Johnson testified he heard "these youngsters" engaging in "a bunch of laughing and joking," but then "a bunch of arguing."

Johnson testified that he heard Lancaster "telling somebody to go get his gun."

> [T]he only thing I heard about the gun, and I heard one guy say, well, you know, this — you know, if you hit me, then we're going to have problems.  And the other guy — I heard another guy say, I think it was the deceased guy, say, well, go get my gun, and he was telling somebody to go get his gun; I don't know who, who the person was.  I don't know who.  I had never saw him before.  I never saw that guy before no more than just standing out there.

Johnson testified he saw Davison run away.

On cross-examination, Johnson admitted Mar'Que's father was "a regular customer, . . . like every other day," and helped him advertise the business.  Johnson admitted he had "previously been convicted for giving the police false information."

Jerry Fluker testified that when Lancaster and Grayson began to fight, "I was just standing back, because I thought they were just going to argue."

> So we figured they would just dispute it out with their hands, they would fight it out, and that would be it, you know, let them fight and thought it was nothing to be really taken that serious besides, you know, somebody punched [Grayson], so he wanted to basically fight back.
> We let it carry on. . . . [N]othing really too damaging at the time.

Jerry testified that after Grayson and Lancaster stopped fighting, Lancaster "was still upset" and "talking trash" to Grayson. Jerry said Lancaster and Grayson were "talking too much" and he "was ready to go by that point." Jerry told Grayson to get in the car while Mar'Que pushed Lancaster in the opposite direction. When Jerry heard Lancaster yell at Grayson, "I'll kill you with my bare hands," Jerry said he "had no choice but to intervene" and got in between Grayson and Lancaster. Jerry testified that Mar'Que was trying to calm down Lancaster and said, "[L]et's not go there with this," but Lancaster "didn't stop."

When Jerry told Lancaster, "[Y]ou're getting out of hand," Lancaster punched him. Jerry testified that Lancaster "said something about getting a gun" and "shoot him."

> [A]s we got into each other's face, . . . I didn't see it coming. He just punched me dead in my face, punched me, and then he flew back, stating like something like signaling to his friend like to get his shit or he had said — well, he had said something about getting a gun or something before then . . . . But after he punched me, he turned to the dude, he was like, shoot, shoot him . . . . To shoot us.

Jerry said, "[M]y brother was like, I'm not playing, and he started firing."

16

The defense argued Mar'Que was entitled to jury instructions on self-defense and the lesser included offenses of manslaughter in the first degree and manslaughter in the second degree. "[I]f you're asserting self-defense, and it's an imperfect self-defense, say too much force is used," the defendant is entitled to jury instructions on the lesser included offense of manslaughter. The State agreed Mar'Que was entitled to a jury instruction on self-defense. The prosecutor argued that viewing the evidence in the light most favorable to Mar'Que, the court should instruct the jury on manslaughter in the first degree "because he said he didn't intend to kill him, and a rational jury could find, I suppose, under these circumstances that he knew of and disregarded the risk that a death would occur when he fired his gun at the victim." The State argued the evidence did not support instructing the jury on manslaughter in the second degree.

> [C]riminal negligence requires that you — you weren't even aware of that risk, and these facts do not support that a rational jury could find it, and the four cases that I cited where the Court found that entitled to a man[slaughter] I but not a man[slaughter] II, or not entitled to either, based on a factual inquiry.

The court agreed to instruct the jury on self-defense. The jury instruction on self-defense states:

> It is a defense to a charge of murder or manslaughter that the homicide was justifiable as defined in this instruction.
> Homicide is justifiable when committed in the lawful defense of the slayer or any person in the slayer's presence or company when:
> (1) the slayer reasonably believed that the person slain intended to inflict death or great personal injury;
> (2) the slayer reasonably believed that there was imminent danger of such harm being accomplished; and

17

(3) the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him, at the time of and prior to the incident.

The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

The court agreed to instruct the jury on manslaughter in the first degree. But the court ruled the evidence did not support giving an instruction on manslaughter in the second degree.

The jury convicted Jerry with felony rendering criminal assistance in the first degree.[2] The jury rejected self-defense and found Mar'Que guilty of the lesser included offense of manslaughter in the first degree.

We, the jury, having found the defendant Marque Fluker not guilty of the crime of Murder in the Second Degree as charged, or being unable to unanimously agree as to that charge, find the defendant Guilty . . . of the lesser included crime of Manslaughter in the First Degree.

By special verdict, the jury found Mar'Que was armed with a firearm when he committed the crime.

## ANALYSIS

### Evidence of Firearm Permit

Mar'Que contends the trial court violated his constitutional right to present a defense by excluding evidence that he had a permit to carry a concealed firearm.

---

[2] Jerry appeals the conviction of rendering criminal assistance in the first degree. We address his appeal in the linked case, State v. Jerry Fluker, No. 74859-9-I (Wash. Ct. App. Sept. 4, 2018).

A criminal defendant has a constitutional right to present a defense. Washington v. Texas, 388 U.S. 14, 23, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); State v. Hudlow, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983). However, the right to present a defense is not absolute. A criminal defendant "has no constitutional right to have irrelevant evidence admitted in his or her defense." Hudlow, 99 Wn.2d at 15.

We review a constitutional claim de novo as a question of law. State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010); State v. Jackman, 156 Wn.2d 736, 746, 132 P.3d 136 (2006). We review the decision to admit or exclude evidence for abuse of discretion. State v. McDonald, 138 Wn.2d 680, 693, 981 P.2d 443 (1999); State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). "The trial court has broad discretion regarding the admission or exclusion of evidence, and the trial court's decision will not be reversed absent a manifest abuse of discretion." State v. Mee Hui Kim, 134 Wn. App. 27, 41, 139 P.3d 354 (2006) (citing State v. Swan, 114 Wn.2d 613, 658, 790 P.2d 610 (1990), cert. denied, 498 U.S. 1046, 111 S. Ct. 752, 112 L. Ed. 2d 772 (1991)).

Before trial, the State filed a motion to exclude evidence that Mar'Que had a permit to carry a concealed firearm. The State argued whether Mar'Que had a permit to possess a firearm was not relevant to determining whether he intentionally shot and killed Lancaster. The State argued:

> [A]ny attempt to introduce such evidence would simply be an
> attempt to portray the defendant in a certain light i.e. as a law-
> abiding citizen who would not commit these crimes As such
> evidence is irrelevant and improper, it should be excluded.

The State moved to exclude the admission of character evidence except

reputation testimony under ER 404(a) and ER 405(a).

The court addressed the motion at the beginning of the trial. The State

argued the "legality of the weapon" is not relevant to self-defense and is

"designed to show that he's a good person, who legally has his gun; and it puts

him in a good light, in an attempt to have the jury make the decision, based on

that."

> It's an implicit way — or, it's an implied way to get that he doesn't have any criminal history, or he doesn't have any criminal convictions; which I also don't think is admissible.
> This is about the actions that day, in that parking lot.
> So, I do think it's just an attempt to try to slip in his good character.

Defense counsel told the court the evidence "isn't character evidence; it's

legality of possession of the firearm. It goes to the legality of his actions, that we

believe it's admissible."

The court agreed the evidence was not relevant but expressed concern

about the perceptions of potential jurors.

> I'm inclined to agree with the State that it isn't probative, ordinarily. But I'm also mindful of the climate of the community, and the concern about lawless gun violence.
> And, although this jury is presumed to follow the Court's instructions — especially, in the last, even, year, the issues of gun violence and legality of weapons and a tendency to presume that people have weapons that they aren't entitled to have — I haven't quite resolved it in my mind.
> And I would be happy to hear from counsel, if counsel has any other case[ ]law that they want to provide to me.

The prosecutor noted the State planned to ask the court to pose general

questions to the jury about firearms. The court reserved ruling until after jury voir

dire.

At the beginning of voir dire, the court asked general questions about whether any juror had "strong feelings . . . one way or the other" about "the use of deadly force as it pertains to self-defense," "the use or possession of firearms," and "allegations of a shooting." The parties questioned jurors who responded to the general questions. The jurors expressed different views. The defense did not exercise all of their peremptory challenges.

After the jury was selected and sworn to hear the case, the State renewed the motion to exclude evidence of the concealed firearm permit.

> I wanted to readdress the issue of Mar'Que Fluker's concealed weapons permit. My recollection during the discussion in regarding the motions in limine, the Court agreed that it wasn't relevant but was concerned about jurors' assumptions they'd make. I think through voir dire it's been proven to be quite the opposite. I'm renewing our motion to exclude it.

The defense attorney did not disagree with the prosecutor's characterization of voir dire. The defense attorney argued the court should allow the defense to introduce evidence that Mar'Que had a permit to carry a firearm.

The court granted the motion to exclude evidence that Mar'Que had a permit to carry a firearm. The court ruled voir dire was "significant in the way that the State suggests" and the evidence was not relevant.

> I actually was interested, very interested, to listen to the voir dire, and I think it was significant in the way that the State suggests it. As I indicated before, it isn't relevant, but the concern was that there might be assumptions the other way. I was pleasantly surprised and pleased to hear how many jurors indicated that they could in fact put aside whether it was lawful or not, and I was a little bit discouraged to hear that at least one or two jurors said that if — that they might actually use the evidence for an improper purpose, and that was to suggest that if a person had a lawful gun, they were more likely to use it lawfully in self-defense, which obviously

21

wouldn't be appropriate.
So I am going to grant the motion to — in limine that there not be any evidence of the possession of the permit either way.

On appeal, Mar'Que does not argue evidence of a permit to carry a firearm is relevant to either the charge of murder in the second degree, the lesser included offense of manslaughter, or self-defense. Instead, for the first time on appeal, Mar'Que claims the absence of the evidence creates an inference of unlawful possession and the evidence is admissible to show law-abiding character.

The record shows Mar'Que did not make these arguments below.

A party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial. Since the specific objection made at trial is not the basis the defendants are arguing before this court, they have lost their opportunity for review.

State v. Guloy, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985),[3] cert. denied, 475 U.S. 1020, 106 S. Ct. 1208, 89 L.Ed.2d 321 (1986).

Under RAP 2.5(a), "appellate courts will not consider issues raised for the first time on appeal." State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). "However, a claim of error may be raised for the first time on appeal if it is a manifest error affecting a constitutional right." Kirkman, 159 Wn.2d at 926 (citing RAP 2.5(a)(3)). Mar'Que contends the decision to exclude evidence that he had a permit to carry a concealed weapon violated his constitutional right to present a defense.

Mar'Que cannot show "actual prejudice that makes the error 'manifest,' allowing appellate review." Kirkman, 159 Wn.2d at 926-27. Mar'Que's attorney

---

[3] Citation omitted.

expressly disclaimed any intent to introduce character evidence. The record shows the defense presented evidence that Mar'Que lawfully possessed the gun. During direct examination, Mar'Que testified that he "legally" owned the gun.

> Q    By the way, on this day, did you own a gun?
> A    Yes.
> Q    Did you legally own a gun?
>           [PROSECUTOR]:    Objection, your Honor.
>           THE WITNESS:    Yeah.
>           THE COURT:    Sustained.

The State did not make a motion to strike and instruct the jury to disregard the testimony. Because the prosecutor did not move to strike, the testimony remains part of the record for the jury to consider. Swan, 114 Wn.2d at 659 (even when an objection is sustained, if the court does not grant a motion to strike or instruct the jury to disregard it, the testimony "thus remain[s] in the record for the jury's consideration.").

Manslaughter in the Second Degree Jury Instruction

Mar'Que contends the court erred by refusing to instruct the jury on manslaughter in the second degree.

RCW 10.61.006 states a defendant "may be found guilty of an offense the commission of which is necessarily included within that with which he or she is charged in the indictment or information." A defendant is entitled to a jury instruction on a lesser included offense if (1) each of the elements of the lesser offense is a necessary element of the charged offense and (2) the evidence in the case supports an inference that only the lesser crime was committed. State v. Workman, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978); State v. Fernandez-

Medina, 141 Wn.2d 448, 455, 6 P.3d 1150 (2000); State v. Henderson, 182 Wn.2d 734, 742, 344 P.3d 1207 (2015).

There is no dispute the legal prong of the Workman test is met. The element of manslaughter in the second degree is a necessary element of intentional murder in the second degree. State v. Berlin, 133 Wn.2d 541, 550-51, 947 P.2d 700 (1997); State v. Bowerman, 115 Wn.2d 794, 806, 802 P.2d 116 (1990).

The factual prong of the Workman test is "more particularized than that required for other jury instructions." Fernandez-Medina, 141 Wn.2d at 455. In determining the factual prong of whether the evidence supports an inference that the lesser crime was committed, we review the evidence in the light most favorable to the party requesting the instruction. Fernandez-Medina, 141 Wn.2d at 455-56. The evidence must raise an inference that "only the lesser included/inferior degree offense was committed to the exclusion of the charged offense." Fernandez-Medina, 141 Wn.2d at 455;[4] Henderson, 182 Wn.2d at 748. "If a jury could rationally find a defendant guilty of the lesser offense and not the greater offense, the jury must be instructed on the lesser offense." Henderson, 182 Wn.2d at 736.

We review the trial court finding under the factual prong of the Workman rule that there was no evidence to support giving an instruction on manslaughter in the second degree for abuse of discretion. Henderson, 182 Wn.2d at 743. Because the factual prong turns on "whether the evidence presented in the case supports an inference that only the lesser offense was committed," " 'some

---

[4] Emphasis in original.

evidence must be presented which affirmatively establishes the defendant's theory on the lesser included offense.' " State v. Condon, 182 Wn.2d 307, 316, 343 P.3d 357 (2015);[5] State v. Perez-Cervantes, 141 Wn.2d 468, 481, 6 P.3d 1160 (2000) (quoting State v. Fowler, 114 Wn.2d 59, 67, 785 P.2d 808 (1990)). "[I]t is not enough that the jury might disbelieve the evidence pointing to guilt." Fernandez-Medina, 141 Wn.2d at 456.

The State charged Mar'Que with intentional murder in the second degree. "A person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person but without premeditation, he or she causes the death of such person." RCW 9A.32.050(1)(a). RCW 9A.08.010(1)(a) defines "intent"—"A person acts with intent or intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime."

The critical difference between the lesser included offense of manslaughter in the first degree and manslaughter in the second degree is whether the person is reckless or negligent in causing the death of another. RCW 9A.32.060(1)(a), .070(1); State v. Gamble, 154 Wn.2d 457, 467, 114 P.3d 646 (2005).

A person is guilty of manslaughter in the first degree when he "recklessly causes the death of another person." RCW 9A.32.060(1)(a). A person acts "recklessly" when he "knows of and disregards a substantial risk" that a homicide may occur and his "disregard of such substantial risk is a gross deviation from

---

[5] Emphasis in original.

conduct that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(c).[6]

A person is guilty of manslaughter in the second degree when "with criminal negligence" he "causes the death of another person." RCW 9A.32.070(1). A person acts with "criminal negligence" when he "fails to be aware of a substantial risk" that a homicide may occur and his "failure to be aware of such a substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).[7]

The trial court instructed the jury on manslaughter in the first degree but refused to instruct the jury on manslaughter in the second degree. The court ruled the evidence supported giving an instruction for the lesser included crime of first degree manslaughter but concluded there is no "factual basis to support the giving of the manslaughter in the second degree."

Mar'Que contends he was entitled to an instruction on manslaughter in the second degree because he reasonably believed he was in imminent danger and needed to act in self-defense but negligently used more force than necessary. Mar'Que argues escalation of the argument between Lancaster and Grayson and the threat Lancaster made to "kill us with his bare hands" and to take Mar'Que's "gun from me and use it" supported instructing the jury on manslaughter in the second degree. We disagree.

---

[6] Emphasis added.
[7] Emphasis added.

While the evidence supports finding Mar'Que knew of and disregarded the substantial risk of homicide when he shot Lancaster, the evidence does not support finding Mar'Que was unaware of a substantial risk of death.

No evidence shows Mar'Que was unaware of the risk of death when he shot Lancaster 8 to 10 times at close range. The undisputed evidence established Mar'Que pulled the gun from the holster in his pants, intentionally pointed the gun at Lancaster, and shot him 8 to 10 times at close range. Mar'Que did not testify he was unaware of the risk of death. Mar'Que testified he did not fire his gun accidentally. Mar'Que testified he intentionally shot and intentionally pulled the trigger each time he shot Lancaster with his Ruger 9 mm semiautomatic gun to "stop him." Mar'Que said he heard Lancaster yell "shoot" Jerry but Mar'Que testified he knew Lancaster did not have a gun on him. Mar'Que's testimony that he only wanted to "stop" Lancaster, not kill him, does not "overcome the presumption that an actor intends the natural and foreseeable consequences of his conduct." Perez-Cervantes, 141 Wn.2d at 481.

Mar'Que argues viewing the evidence in the light most favorable to him, a jury could find he "acted merely negligently in using more force than necessary against Lancaster in self-defense." Mar'Que contends he did not know whether Lancaster had a gun and he heard Lancaster order someone to shoot his brother. Mar'Que cites State v. Schaffer, 135 Wn.2d 355, 957 P.2d 214 (1998), and State v. Chambers, 197 Wn. App. 96, 387 P.3d 1108 (2016), review denied, 188 Wn.2d 1010, 394 P.3d 1004 (2017), in support of his argument. Neither Schaffer nor Chambers address the legal distinction between manslaughter in

27

the first degree and manslaughter in the second degree and are factually distinguishable.

In Schaffer, the defendant Schaffer testified that after leaving a club, the victim "threatened to kill him." Schaffer, 135 Wn.2d at 357. When the victim moved his arm behind his back, "Schaffer thought he was reaching for a gun." Schaffer, 135 Wn.2d at 357. Schaffer pulled out his gun and shot the victim five times—twice in the back and three times in the legs. Schaffer, 135 Wn.2d at 357. The State charged Schaffer with premeditated second degree murder. Schaffer, 135 Wn.2d at 357. The trial court instructed the jury on self-defense but refused to instruct the jury on manslaughter. Schaffer, 135 Wn.2d at 357. On appeal, the State conceded there was "sufficient evidence to permit the jury to find Shaffer acted in the reasonable belief he was in imminent danger." Schaffer, 135 Wn.2d at 358. The court noted the concession and states the additional evidence that Schaffer shot the victim five times, including twice in the back, was sufficient to "support a finding that he recklessly or negligently used excessive force to repel the danger he perceived. The jury should therefore have been instructed on manslaughter as a lesser included offense to the first degree murder alternative." Schaffer, 135 Wn.2d at 358.

In Chambers, we held the evidence supported the trial court decision to instruct the jury on the lesser included offense of manslaughter in the first degree. Chambers, 197 Wn. App. at 122. Because Chambers testified that he believed the victim Hood was " 'going to kill me,' " a jury could reasonably find he acted recklessly when he fired "the two fatal shots directly into Hood's back after

he turned away and could no longer hold the shovel." <u>Chambers</u>, 197 Wn. App. at 122.

We affirm the jury conviction of manslaughter in the first degree while armed with a firearm.

_Leinweber, J._

WE CONCUR:

_Trickey, J_          _Becker, J._