IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br>v.<br><br>KEVIN ALEXANDER RODRIGUEZ,<br><br>     Appellant. | No. 84205-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — A jury convicted Kevin Rodriguez of manslaughter in the first degree after the trial judge declined to instruct the jury on manslaughter in the second degree based on the fact Rodriguez testified that he was acting in self-defense. Viewing the evidence in the light most favorable to the party requesting the instruction, despite Rodriguez's own testimony, other admitted evidence created an inference where a jury could have found that Rodriguez was in such a psychotic delusional state that he did not know of and disregarded a substantial risk that a wrongful act may occur, but that he did act criminally negligent. Because there was a factual basis to instruct the jury on manslaughter in the second degree, the trial court abused its discretion by failing to do so when requested. We reverse and remand for further proceedings.

Citations and pincites are based on the Westlaw online version of the cited material.

FACTS

In February 2019, Antonio Robles Mendez shared an apartment in Monroe, Washington, with six other men. He shared the master bedroom with Daniel Aquino Indalecio. Leonel Martinez Martinez shared a room with Josue Galvan Tereso. Damaso Martinez Crus shared a third bedroom with someone also named Antonio who went by the name Moises. The seventh roommate was Evodio Garcia Martinez, known to others by the name "Bodio," who always slept on the couch in the living room with the same particular set of blankets completely over him.

Around 10 p.m. on February 9, Robles Mendez, along with Galvan Tereso, Martinez Martinez, and Aquino Indalecio, left to go to a casino. When they were leaving, Garcia Martinez was on the couch, awake but preparing to go to sleep, and the two other remaining roommates stayed behind to sleep in their shared room.

Robles Mendez and the others returned some time between 1 and 2 a.m. They entered the apartment[1] and saw a blanketed form on the living room couch where Garcia Martinez usually slept. Suddenly, Rodriguez walked out of the bedroom that Galvan Tereso and Martinez Martinez shared.

Rodriguez and Robles Mendez knew each other. Rodriguez testified at trial that Robles Mendez had invited Rodriguez to stay at the apartment earlier that day or the previous night. Robles Mendez denied having invited Rodriguez to stay at the apartment. Robles Mendez did not initially recognize Rodriguez because he wore a black bandana and a hooded sweatshirt. Without explanation, Rodriguez began attacking the returning roommates with two knives. Robles Mendez first recognized

_____

[1] The jury heard conflicting testimony as to whether the door was locked when the men returned to the apartment.

2

Rodriguez when the bandana covering his face began falling off. During the ensuing physical confrontation where the roommates tried to subdue Rodriguez, Rodriguez slashed Martinez Martinez in the arms and Robles Mendez's shoulder and next to his eye. Rodriguez locked Galvan Tereso and Aquino Indalecio outside the apartment after they had fled at the initial shock of the attack. Robles Mendez either threw a vacuum or a fan at Rodriguez, knocking him over. The roommates were able to wrestle one of the knives away from Rodriguez and unlock the front door to let the two other roommates back inside to assist in the struggle. The men wrestled Rodriguez to the ground, took the last knife away from Rodriguez and tied his wrists.

During the struggle, the men landed on Garcia Martinez who was under the blanket on the couch and did not move. After shifting the blanket on the couch, they discovered that Garcia Martinez had been brutally stabbed to death.

Robles Mendez recalled that during the confrontation Rodriguez said he was sorry, he didn't do it and that there were "more people outside in the Tahoe." Robles Mendez ran out to the doorway and saw a gray car that was leaving the apartment complex but did not recognize anyone in it. Martinez Martinez remembers Rodriguez was silent during the initial attack, but after they subdued him Rodriguez began to say that it wasn't him and started to repeat the name "Chuy."

After the roommates discovered that Garcia Martinez was dead, Rodriguez continued attempts to rise up and Martinez Martinez began to hit Rodriguez in the head with a frying pan while Galvan Tereso struck Rodriguez with a wooden board. Robles Mendez stepped out of the apartment and called 911.

3

Monroe Police arrived and found Robles Mendez holding a rag to his head to staunch blood flow from the laceration he had received. Robles Mendez directed police inside the apartment by calling out: "Hurry, hurry. He's in here. He killed him." Officers could hear banging and scuffling from within the apartment along with a shout of "Chuy, no, stop." Officer Trevor Larson rushed up the stairs and looked inside the foyer where he saw six males[2] pinning Rodriguez against a half-wall inside the entrance to the apartment. Rodriguez had injuries to his face and hands and was slick with blood. Robles Mendez indicated to police that Rodriguez had killed Robles Mendez's roommate.

As police officers escorted Rodriguez down the landing and handcuffed him, Rodriguez struggled and shouted a constant string of unprompted phrases: "Chuy, no. Chuy, stop. Chuy, don't hurt me." As the officers placed Rodriguez in the backseat of officer Larson's patrol car, Rodriguez continued to protest and shout repetitive and rambling phrases, among them: "Alberto, tell him the truth." "Not the car, not in the car, Chuy, no." "No dragging, no dragging."

As Larson drove Rodriguez to the EvergreenHealth hospital in Monroe, Rodriguez continued to shout: "Chuy, don't hurt me, Chuy, stop." Larson asked Rodriguez if he could tell the officer his name, to which Rodriguez responded "it's K-Rod." Upon arrival at the emergency room drop off area, and in response to the shouting of "stop hurting me, don't hurt me" from Rodriguez, Larson told Rodriguez they were not hurting him, that he was the police and they had arrived at a hospital, then

---

[2] Robles Mendez said Martinez Crus and the other Antonio were not initially part of the fight but came out when they heard the police. Martinez Crus testified that he did not hear anything the night of the murder as he had gone to sleep early and was woken up after police arrived.

identified himself as Larson, at which point Rodriguez responded by saying "the big one," "the little one," and "the little Larson." When hospital staff arrived with a gurney, Rodriguez was escorted out of the squad car and onto it, all the while saying "stop, don't hurt me," and "no, no, Chuy's out there." Rodriguez erratically mumbled or screamed about "Chuy" in between cries of pain as his clothing was cut off of him and hospital staff examined his injuries. Rodriguez had numerous injuries, bruising, cuts, and a brain bleed. A toxicology report confirmed the presence of methamphetamine and alcohol in Rodriguez's blood draw. He would later be transferred to a Seattle hospital to treat the brain bleed, which was almost certainly incurred during the struggle at the apartment.

A Snohomish County Medical Examiner testified that Garcia Martinez was killed by "a large slashing wound of his throat that went through his carotid arteries and the jugular veins all the way through on both sides." The injuries were inflicted while he was laying faceup on the couch and Garcia Martinez likely died "basically in the position where [medical examiners] first saw him." The medical examiner estimated 70 discrete injuries on the victim's body, including 20 or 21 injuries just to his face. These were sharp incisions all the way to the facial bones. The nature of injuries to the abdomen and liver along with blood pooling analysis suggested that many of these stab wounds were made after the victim had already died. The defects and blood on the blanket that had reportedly covered Garcia Martinez were consistent with the multiple stab wounds. Overwhelming forensic evidence linked Rodriguez to the knives found at the scene and the victim.

Rodriguez testified at trial that on February 9, having previously been given permission to stay in the apartment by Robles Mendez, he moved in some of his belongings, bought and used methamphetamine, went to a gym, then drank alcohol in the apartment. Then he heard the sound of a car, which he believed (based on the unique exhaust note) to be that owned by his friend, Chuy.[3] According to Rodriguez, he then heard Chuy and a group of individuals go up the stairs where he met them at the door, then they pushed their way into the apartment, punched Rodriguez, and demanded money. Rodriguez testified that as he fought back to defend himself, the man who had up to this point been laying on the couch under a blanket rose up to join with Chuy and the other assailants, brandished a gun, and threatened to shoot Rodriguez. Rodriguez then retrieved his pair of kitchen knives and slashed at the gun-wielding man's face twice, whereupon the man "fell backwards to where he got up from the couch." Rodriguez testified he was in fear for his life and "wasn't going to sit there and find out if he was going to shoot me."

Rodriguez testified that he knew Garcia Martinez because they were "in the same apartment" and in passing from him working in a Mexican grocery store. Rodriguez identified Garcia Martinez as the man he slashed in the face twice, but there was "no way" he was responsible for the many grievous injuries shown in autopsy photographs. Rodriguez testified that he had no prior disagreement with or reason to want to harm or kill Garcia Martinez.

---

[3] Chuy was identified as the nickname of a real person, Jesus Padilla, who lived in the neighborhood according to other witness testimony, but only Rodriguez identified Chuy as being present in the apartment at any time that night. Police sought contact with Padilla without success.

Rodriguez said that after slashing at Garcia Martinez he fled to a bedroom where he locked the door behind himself and smoked methamphetamine. Rodriguez testified that he was again attacked at some point but that Chuy was no longer there and he did not recognize the faces of any of his assailants, and the fight "probably ended because I lost." Rodriguez has vague memories of the arrival of the police, but did not recognize his own actions as shown by body cam footage. Rodriguez also testified that he does not remember being able to focus much that night.

The defense called an expert witness, Dr. Mark Koenen, a general and forensic psychiatrist with experience in drug-induced psychosis. Dr. Koenen evaluated Rodriguez by interviewing him twice as well as reviewing, among other information, a psychological evaluation conducted by another psychologist, police reports, body camera footage, and a toxicology report from the night of Rodriguez' arrest. Dr. Koenen testified that he had diagnosed Rodriguez with alcohol use disorder, methamphetamine use disorder, and a transient psychotic disorder secondary to the methamphetamine use. Symptoms of that diagnosis included agitation, violence, paranoia, and poor reality testing (in short, paranoid delusions). Dr. Koenen testified that long-term methamphetamine use can result in delusions that persist months and possibly even years.

Dr. Koenen explained that these paranoid delusions could manifest as beliefs in unreal aggressors tormenting the individual, and that Rodriguez' behaviors the night of the arrest were consistent with such symptoms. Koenen further testified:

> Psychosis can affect intent if you don't know what you're doing . . . say
> you were in a psychotic state and you're seeing things and hearing things
> and you're delusional. Your intent could be to shoot a werewolf because
> you see it right in front of me . . . [but, the bullet] hits me. You didn't intend

7

to shoot me, you intended to shoot this thing that was in your house that, frankly, wasn't there.

Although Dr. Koenen used fantasy antagonists like werewolves, extraterrestrials, and demons to illustrate extreme cases of these psychotic delusions, he also made clear that more mundane and facially believable but no less false delusions were possible ("like my neighbor was trying to kill me . . . I remember they were here, I remember they threatened me. It may never have happened") and that Rodriguez' symptoms appeared to fit this pattern. From the interviews he had done with Rodriguez, Dr. Koenen described Rodriguez's impressions of that night as "vague memories and . . . very fragmentary. It was like talking to somebody about a dream they had." Dr. Koenen further testified that in his medical opinion Rodriguez was suffering from delusions the night Garcia Martinez was killed.

Dr. Koenen also explained that potential motives and efforts to cover up a crime are some things a forensic evaluation considers. "It's always a question of is this thing that happened a result of mental illness or just somebody basically lying about it." In Rodriguez's case, Dr. Koenen observed that there was neither evidence of a coherent motive nor an attempt to cover up the crime and that Rodriguez' behavior afterward as observed by eyewitnesses was completely disorganized. Dr. Koenen testified that Rodriguez's behavior closer in proximity to the drug use was probably even more disorganized. Dr. Koenen testified that "[i]t really has the feel of something that is the product of psychosis."

Though Rodriguez did suffer a head injury and brain bleed during the confrontation with the roommates, Dr. Koenen testified that this fact did not alter his evaluation because Rodriguez was released the very next day from the hospital and "it

8

probably resolved pretty quickly." During cross examination, the prosecutor asked Dr. Koenen to address Rodriguez's admissions made at trial.

> [Prosecutor:] Dr. Koenen, would it impact your opinion of your evaluation if you were aware that Mr. Rodriguez testified that he did intend to stab Evodio?

> [Answer:] Wouldn't change it if it was a – if he was still operating from some delusion about defending himself.

At the end of trial, Rodriguez proposed multiple jury instructions, including manslaughter in the second degree.[4] The court instructed the jury on self-defense, voluntary intoxication, diminished capacity, evidence of mental illness, murder in the first degree, murder in the second degree, and manslaughter in the first degree. The court declined to instruct the jury on manslaughter in the second degree. The court explained, "I don't find that there is sufficient factual basis for a negligence standard based upon the evidence that's been presented, so that's why I'm not giving that manslaughter."

At closing, the defense argued that Rodriguez' and Koenen's testimony mandated a conviction for manslaughter in the first degree:

> If you believe Kevin was in that apartment and stabbed Evodio Garcia Martinez, ask yourself why. . . . If you take the uncontroverted testimony of Dr. Koenen, then he couldn't form intent or premeditation. That leaves you with manslaughter in the first degree. That's the uncontroverted testimony in this case.

The jury found Rodriguez not guilty of murder in the first degree, but guilty of manslaughter in the first degree and the two counts of assault in the second degree. The jury also found that Rodriguez was armed with a deadly weapon for all counts.

---

[4] These proposed instructions were consistent with the relevant Washington Practice Series Criminal Instructions. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.04 (3d ed. 2008) (WPIC), 28.05, 28.06.

DISCUSSION

The trial court denied Rodriguez's request to instruct the jury on manslaughter in the second degree because the court did not find a sufficient factual basis to support giving the instruction. Rodriguez assigns error to this ruling.

A defendant "may be found guilty of [a lesser included offense,] the commission of which is necessarily included within that with which he or she is charged in the indictment or information." RCW 10.61.006. "The statutory right to lesser included offense instructions 'protect[s] procedural fairness and substantial justice for the accused.'" State v. Avington, No. 101398-1, slip op. at 14 (Wash. Sept. 28, 2023), https://www.courts.wa.gov/opinions/pdf/1013981.pdf (quoting State v. Coryell, 197 Wn.2d 397, 412, 483 P.3d 98 (2021)). Giving juries the option to convict on a lesser included offense

> is crucial to the integrity of our criminal justice system because when defendants are charged with only one crime, juries must either convict them of that crime or let them go free. In some cases, that will create a risk that the jury will convict the defendant despite having reasonable doubts.

Coryell, 197 Wn.2d at 418 (quoting State v. Henderson, 182 Wn.2d 734, 736, 344 P.3d 1207 (2015)). The test to determine whether a criminal defendant is entitled to instruction on a lesser included offense has two prongs, one legal and one factual. State v. Workman, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978). The trial court and the parties agreed that the legal prong of Workman was satisfied. "[F]irst and second degree manslaughter are lesser included offenses of second degree intentional murder and instructions should be given to a jury when the facts support such an instruction." State v. Berlin, 133 Wn.2d 541, 551, 947 P.2d 700 (1997).

The standard of review applied to jury instructions depends on the trial court's decision under review.  Coryell, 197 Wn.2d at 405.  We review a trial court's decision not to give a jury instruction for an abuse of discretion if the decision is based on a factual determination, while if it is based on a legal conclusion it is reviewed de novo.  Id.  Because the issue before the panel is the factual prong of the Workman test, we review under the abuse of discretion standard.

In determining whether evidence supports an inference that the lesser crime was committed, we review the evidence in the light most favorable to the party requesting the instruction.  State v. Fluker, 5 Wn. App. 2d 374, 397, 425 P.3d 903 (2018).  "If a jury could rationally find a defendant guilty of the lesser offense and not the greater offense, the jury must be instructed on the lesser offense."  Henderson, 182 Wn.2d at 736.

The distinction between manslaughter in the first and second degree is the level of culpability.  The jury was instructed that "[a] person commits the crime of manslaughter in the first degree when he or she recklessly causes the death of another person unless the killing is justified."  Another instruction explained that

> A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that death may occur and this disregard is a gross deviation from conduct that a reasonable person would exercise in the same situation.
> When recklessness as to a particular result is required to establish an element of a crime, the element is also established if a person acts intentionally as to that result.

Rodriguez had proposed a to-convict instruction for manslaughter in the second degree, which would have required the jury to find that Rodriguez "engaged in conduct of criminal negligence" and that Garcia Martinez died as a result of Rodriguez's negligent

acts. <u>See</u> RCW 9A.32.070 ("A person is guilty of manslaughter in the second degree when, with criminal negligence, he or she causes the death of another person.").

> A person is criminally negligent or acts with criminal negligence when he or she fails to be aware of a substantial risk that a wrongful act may occur and this failure constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation.
> When criminal negligence as to a particular fact is required to establish an element of a crime, the element is also established if a person acts intentionally or knowingly or recklessly as to that fact.

WPIC 10.04; RCW 9A.08.010(1)(d).

The State argues that "the difference between the two degrees of manslaughter is the determinative issue and there was no evidence the defendant acted only negligently." The State makes this argument despite the fact it correctly quotes the Supreme Court's clarification of the analytical test in <u>Coryell</u>:

> The test was never intended to require evidence that the greater, charged crime was not committed—only that a jury, faced with conflicting evidence, could conclude the prosecution had proved only the lesser or inferior crime.
>
> . . .
>
> In sum, we reaffirm that the factual requirement for giving a lesser or inferior degree instruction is that *some evidence* must be presented— from whatever source, including cross-examination—which affirmatively establishes the defendant's theory before an instruction will be given.

(quoting <u>Coryell</u>, 197 Wn.2d at 414-15) (emphasis added).

The State argues that Rodriguez's testimony established that he intended to stab the victim in the face repeatedly and that, even in light of Dr. Koenen's testimony, the jury would have to disregard the defendant's testimony to find that he was merely negligent. The State adds, "no person would fail to be aware of a substantial risk of homicide where he stabs a person in the head with chef's knives." But the question is

not whether the evidence establishes that Rodriguez acted *only* negligently.  The question is whether the jury, faced with conflicting evidence, *could* conclude that Rodriguez acted negligently by knowing of and disregarding a substantial risk:

> The reason lesser included instructions are given is to assist the jury in weighing the evidence, determining witness credibility, and deciding disputed questions of fact.  The jury, not the trial judge, is "the sole and exclusive judges of the evidence."  Although there may be conflicting evidence, this evidence presents a question of fact for the jury.  The conflicts in the evidence merely present a question of fact for the jury.

Coryell, 197 Wn.2d at 414 (citation and internal quotation marks omitted) (quoting State v. McDaniels, 30 Wn.2d 76, 88, 190 P.2d 705 (1948), overruled in part on other grounds by State v. Partridge, 47 Wn.2d 640, 289 P.2d 702 (1955)).

The State's argument is grounded in its position that the jury had to believe Rodriguez's trial testimony that he intended to stab the victim in the face.   What the State ignores is that the jury can choose to accept or reject Rodriguez's testimony in whole or in part.  The jurors were correctly instructed that they were "the sole judges of the credibility of each witness" and were "the sole judges of the value or weight to be given to the testimony of each witness."  See Moen v. Chestnut, 9 Wn.2d 93, 102, 113 P.2d 1030 (1941) (observing that a jury is not limited, in its findings, to the direct testimony of any one witness and is "free to accept, or reject, any part of the testimony of any witness").

The jury heard evidence that questioned Rodriguez's mental state.  Rodriguez admitted to using methamphetamine that night and a toxicology report confirmed it to be true.  He exhibited delusional thinking while with his roommates, police, and at the hospital.  Dr. Koenen, a forensic psychologist, examined Rodriguez and diagnosed him with alcohol use disorder, methamphetamine use disorder, and a transient psychotic

disorder secondary to the methamphetamine use. Dr. Koenen testified that psychosis can affect intent if someone does not know what they are doing. Though Rodriguez testified at trial that he stabbed Garcia Martinez as a reaction to Garcia Martinez pointing a gun at Rodriguez, Dr. Koenen's testimony suggested that this testimony itself could be a product of delusion. Dr. Koenen explained that long-term methamphetamine use can result in delusions that persist months and even years. Rodriguez testified that he does not remember being able to focus much on the night in question. Dr. Koenen, who interviewed Rodriguez twice, said Rodriguez's impressions of that night were "vague memories . . . very fragmentary. It was like talking to somebody about a dream they had."

At trial during questioning, Rodriguez repeatedly was asked about the police officer body cam footage that captured his behavior at the time of arrest and was played during trial. Rodriguez testified that he did not remember much of it. His own testimony of stabbing Garcia Martinez twice while he was standing in front of the door and watching him fall back onto the couch was contradicted by the medical examiner and forensic evidence that showed Garcia Martinez to have suffered about 70 discrete injuries, including 20 or 21 sharp incisions to the face. Garcia Martinez was laying on his back on the couch at the time he was killed. The stabbing continued even after he was dead. A reasonable juror could have found that Rodriguez's testimony was a delusional attempt to make sense of the evidence presented at trial and not necessarily evidence beyond a reasonable doubt of what Rodriguez was thinking the night Garcia Martinez was killed.

The evidence is such that a jury *could* find that Rodriguez was in such a psychotic delusional state that he did not know of and disregarded a substantial risk that a wrongful act may occur, but did act criminally negligent by failing to be aware of a substantial risk that a wrongful act may occur. But the jury was not given this option.

It does not matter that Rodriguez argued that he acted in self-defense. "[I]t is generally permissible for defendants to argue inconsistent defenses so long as they are supported by the evidence." State v. Frost, 160 Wn.2d 765, 772, 161 P.3d 361 (2007). While a trial court should "'in all cases . . . restrict the argument of counsel to the facts in evidence,'" they still "'cannot compel counsel to reason logically or draw only those inferences from the given facts which the court believes to be logical.'" Id. (second alteration in original) (internal quotation marks omitted) (quoting State v. Perez-Cervantes, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000); City of Seattle v. Arensmeyer, 6 Wn. App. 116, 121, 491 P.2d 1305 (1971)).

The courts should "err on the side of instructing juries on lesser included offenses." Henderson, 182 Wn.2d at 736.

State v. Fernandez-Medina is instructive. There, the defendant argued that by withholding an instruction on assault in the second degree the trial court prevented a presentation to the jury of an alternative theory of the case, while the prosecution countered that the instruction was unwarranted due to the presentation of an alibi defense. 141 Wn.2d 448, 457, 6 P.3d 1150 (2000). The Washington Supreme Court reversed the Fernandez-Medina trial court's denial of the requested instruction, noting that "[i]f the trial court were to examine *only the testimony of the defendant*, it would have been justified in refusing to give the requested inferior degree instruction . . . [but

that the] trial court is not to take such a limited view of the evidence . . . when it is deciding whether or not an instruction should be given." 141 Wn.2d at 455-56 (emphasis added). Similarly, in the instant case, the trial court appeared to follow the State's argument of focusing on the defendant's testimony rather than take an appropriately-expansive view of the evidence and permit the defense to present their theories, as supported by that evidence, to the jury.

The trial judge's denial of an instruction on manslaughter in the second degree necessarily limited how the defense presented its theory of the case to the jury. The defense argument as presented to the jury at closing largely took Rodriguez' testimony at face value, contending that from the standpoint of Rodriguez' memories of that night he committed a subjectively reasonable act of self-defense by stabbing Martinez twice in the face after Martinez pointed a gun at Rodriguez. Without the instruction on manslaughter in the second degree, Rodriguez could not suggest an alternative verdict to the jury.

The State cites Avington to support its argument that this court "must apply deferential review" under the abuse of discretion standard and that, because the trial did not apply an incorrect legal standard and the court's application of the factual prong was reasonable, we should affirm. Specifically, the State argues,

> One reasonable interpretation of the evidence may be that a juror could reasonably infer that diminished capacity in one scenario, forming intent, also means an ability to appreciate risk is affected. However, the question before this Court is whether *another* reasonable interpretation, the one the trial court adopted, is that general testimony about a defendant's behavior and the possible effects of methamphetamine use, in light of "all of the evidence," failed to support an inference that this defendant could not appreciate the risks of his actions. Where a trial court applies the factual prong of Workman, this Court must apply deferential review. The trial court's factual determination was reasonable.

The State misreads Avington. The Washington Supreme Court did not affirm the Avington trial court's decision to not instruct on manslaughter out of deference to the trial court's reasonable interpretation of the evidence. In fact, the Supreme Court expressly noted that "Avington correctly notes that in its oral ruling, the trial court stated that 'the physical evidence undermines greatly the *credibility* of Mr. Avington's assertion that he did not aim at anybody in particular.'" Avington, slip op. at 21. It was because of that statement by the trial court that our Supreme Court, quoting Coryell, 197 Wn.2d at 414-15, wrote

> We take this opportunity to reaffirm that the members of the jury, not the trial judge, are "the sole and exclusive judges of the evidence." Thus, genuine questions of credibility must be left to "the jury's decision." We reaffirm that it is an abuse of discretion for a trial court to "weigh[ ] the evidence and deny[ ] a lesser included instruction when the evidence presented should have been weighed by the jury."

Avington, slip op. at 21-22 (internal citations omitted). The Supreme Court, nonetheless, affirmed the conviction because Avington's testimony did not create any relevant factual dispute for the jury's determination.[5] Id. at 22.

Unlike the defendant's testimony in Avington, in the instant case Rodriguez's testimony *did* create a relevant factual dispute. The physical evidence as to how Garcia Martinez died contradicted Rodriguez's version of events. Dr. Koenen's testimony,

---

[5] Avington was charged under accomplice liability for inciting and participating in a gunfight. His co-defendant testified to intentionally firing the shots that killed the victim. Avington, slip op. at 9. The Supreme Court observed that

> [t]he undisputed evidence at trial showed that the bullet that killed [the victim] did not come from Avington's gun. As a result, Avington's testimony about the direction of his aim did not create a question of fact for the jury as to whether he participated in [the victim]'s death under circumstances manifesting an extreme indifference to human life. In other words, contrary to Avington's argument, it simply did not matter whether Avington was aiming directly at anyone or not.

Id. at 2.

toxicology reports, and witness testimony supported a reasonable inference that Rodriguez was in a psychotic delusional state at the time Garcia Martinez was killed. Thus, some evidence existed to support instructing the jury on manslaughter in the second degree.  It was for the jury, not the judge, to weigh the evidence.

For these reasons, we conclude that the trial court abused its discretion in denying Rodriguez's request to instruct the jury on manslaughter in the second degree. We reverse the manslaughter conviction and remand for further proceedings.[6]

_Coburn, J._

WE CONCUR:

_Feldman, J._

_Hazelrigg, ACJ_

---

[6] Rodriguez also appeals the imposition of the DNA (Deoxyribonucleic Acid) collection and community custody supervision fees.  The parties agree and the record supports that these fees were reflected on the judgment and sentence in error.  Though we reverse the manslaughter conviction, we nonetheless point out these errors for the trial court to strike these legal financial obligations because the sentence included Rodriguez's two other convictions of assault in the second degree.