# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 55375-9-II |
| Respondent, | Consolidated with |
| v. | |
| MILES JOSEPH MINKLER, | |
| Appellant. | |
| STATE OF WASHINGTON, | No. 55385-6-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| RYAN JAMES RODRIGUEZ, | |
| Appellant. | |

GLASGOW, C.J.—Ryan James Rodriguez and Miles Joseph Minkler were convicted of first degree robbery, first degree burglary, second degree assault, and first degree attempted kidnapping for robbing and assaulting Edward Matheson at his house. Their accomplice, Michael Fischer, testified against them at their joint jury trial.

In this consolidated appeal, Rodriguez argues his trial counsel was constitutionally ineffective, and Minkler argues Rodriguez's counsel deprived him of a fair trial. We conclude that Rodriguez's counsel performed deficiently and that his deficient performance prejudiced Rodriguez, requiring reversal of Rodriguez's convictions and a new trial. Minkler was not deprived of a fair trial, however. We affirm Minkler's convictions.

Minkler also challenges his sentence. He argues his assault conviction elevated his robbery conviction to the first degree, so it must be vacated on double jeopardy grounds, and the State concedes that the trial court intended to merge these offenses. Because the basis for elevating Minkler's robbery conviction to the first degree was ambiguous, we accept the State's concession and remand for the trial court to merge Minkler's assault conviction. Minkler was also sentenced with an incorrect offender score, so the trial court will resentence him on remand and strike witness fees and mileage costs.

FACTS

I. BACKGROUND

Edward Matheson lived alone in rural Washougal, Washington. The area was secluded and wooded. During summer 2019, Matheson hired Rodriguez to pressure wash his house. Matheson later recalled that while Rodriguez was working, Matheson heard the window next to his computer "crack open." 2 Verbatim Report of Proceedings (VRP) at 572.

Matheson thought Rodriguez did an "awesome" job. *Id.* at 576. Matheson knew that Rodriguez's girlfriend was pregnant and he needed money, so Matheson later texted Rodriguez about the possibility of Rodriguez painting the house. Rodriguez then asked whether Matheson wanted him to install "security lights," but Matheson declined. *Id.* at 577. At the time, Matheson had some old motion sensor lights, some of which were broken. Rodriguez did not end up doing any additional work on Matheson's house.

In the evening on November 12, 2019, Matheson came downstairs to play video games and "saw that there was no computer and the window was wide open." *Id.* at 579-80. The computer monitor was still there, so Matheson assumed whoever had taken the computer tower was still on

the property and he began yelling. He went outside and continued to yell, and he saw his computer and camera tripod on the ground at the corner of the house.

Someone "jumped out and said [']don't move, I'll f[***]ing shoot you right now[']" while pointing a gun at Matheson's face. *Id.* at 585. Matheson ducked his head and charged into the person. The motion sensor lights at his home had been unscrewed, except for one over the front porch that was more difficult to reach. Matheson testified that he could not see the person who approached him with the gun or make out any of their features. He thought they were "kind of a little tall," or at least taller than he was at approximately "5' 9" and a half." *Id.* at 578, 600. And he thought they were wearing gloves.

Someone hit him in the back of the head several times as Matheson fell to his knees, and then someone grabbed Matheson around the neck. Other people approached Matheson, and the first person "started yelling [']kick the s[***] out of him.[']" *Id.* at 589. The assailants kicked Matheson numerous times. He "couldn't make anything out at that point" about what the people looked like. *Id.* at 590. He thought that there were four people involved and that they were likely young, either teenagers or in their 20s. Matheson testified, "They just kept kicking until I went limp . . . and then I came back to [consciousness] and no one was around me." *Id.* at 592.

Matheson went into his house and found an old shotgun. There was a pickup truck leaving his driveway, and he shot toward the front of the truck at its "bumper, radiator area." *Id.* at 596. Matheson thought it was either a Toyota Tundra or Toyota Tacoma and that it was either black or dark blue. The truck sped off toward Washougal. Matheson went back into his house and called 911. He told the operator he thought three or four people were involved, but he was not able to give a physical description of anybody, except that the first person was "taller." *Id.* at 605.

Responding officers collected an air pistol, "a $CO_2$-powered BB gun of sorts," from Matheson's front yard that "looked fairly realistic," as well as "a multi-tool," and they collected a black nitrile glove from the driveway. *Id.* at 690; 3 VRP at 1240, 1243. Matheson had a four-centimeter laceration on his head that required six staples, a fractured forearm, and "some mild discomfort on his right lower quadrant of his abdomen." 2 VRP at 768.

## II. INVESTIGATION

On the night of the offense, a maroon Toyota truck was parked at Fern Prairie Market with its hood open and two men near it. Fern Prairie Market is a popular convenience store near Washougal with a gas station, but it was closed at the time. Law enforcement created a bulletin with still frame pictures from the market's security footage "attempt[ing] to identify" a subject getting out of the truck. *Id.* at 887. An officer who was familiar with Minkler was "[a] hundred percent certain" the person in the picture from Fern Prairie's security footage was Minkler. *Id.* at 914.

The officer who recognized Minkler went to Minkler's home and saw a maroon Toyota truck parked outside. The truck was registered to Lyndon Fischer, Michael Fischer's father. Detective Jeremy Schultz inspected the front of the truck and noted "damage which was consistent with birdshot or a shotgun shot type damage." 3 VRP at 1183. Schultz sealed the truck and towed it as evidence. A black glove similar to the one found in Matheson's driveway was found in the back seat of the truck.

There was also a BMW parked outside Minkler's home that was registered to Lyndon Fischer. "Looking through the windows of the BMW from the outside, [Schultz] could see in the back passenger seat, directly behind the driver's seat, there was a computer." *Id.* at 1184. Schultz did not seize the BMW, but he was later able to confirm that this was Matheson's computer. Police

eventually found the computer at Fischer's parents' house, where Fischer was also living. Fischer had sold some of its parts.

Minkler and Fischer were arrested. Fischer decided to explore a plea deal. As part of his negotiations with the State, Fischer told law enforcement about Rodriguez's involvement in the crime. Matheson had also told law enforcement that he was suspicious of Rodriguez. And police were aware that Rodriguez knew Minkler.

Rodriguez was arrested and joined as a codefendant with Minkler. Minkler and Rodriguez were charged as accomplices with first degree robbery, first degree burglary, second degree assault, and first degree attempted kidnapping. The State waited to finalize the charges against Fischer until after he testified against Minkler and Rodriguez.

### III. PRETRIAL MOTIONS

After Minkler was arrested, Matheson found a connection between Minkler and Rodriguez "through his research on social media." 1 VRP at 283-84. But the trial court excluded "any reference that [Matheson] looked at social media and determined that [Minkler and Rodriguez] were associated together," based on hearsay and a lack of foundation. *Id.* at 289.

The State moved in limine to admit a prior conviction for burglary in order to impeach Rodriguez's credibility if he testified. The trial court ruled that Rodriguez's prior conviction for burglary was a crime involving dishonesty that could be introduced for impeachment purposes because the criminal intent underlying the burglary was to commit theft. Although Rodriguez also had a prior conviction for arson that was "part of the same . . . criminal incident," the State and the trial court agreed that Rodriguez's arson conviction would remain inadmissible. *Id.* at 292. Addressing how the impeachment process would work, the trial court explained that if Rodriguez admitted to the burglary conviction, "the issue [would be] essentially over." *Id.* If he denied the

conviction, the State could introduce the judgment and sentence with the arson conviction redacted. The trial court reiterated this ruling when it reviewed Rodriguez's motions in limine.

After receiving notice of a potential character witness, the State also moved to exclude any witness's personal opinion of Rodriguez's character. The trial court did not make a specific ruling but reminded Rodriguez's counsel that character evidence "is just generally not admissible at all" unless it is pertinent to the specific crime charged and admonished that during trial, "we don't get into . . . this is a good person and this is a bad person." *Id.* at 348-49. Rodriguez's counsel did not confirm what specific character trait the potential witness would testify to but suggested the witness would testify that Rodriguez "has a good reputation with the community." *Id.* at 353.

IV. TRIAL

A.      Rodriguez's Opening Statement

Rodriguez's counsel emphasized several points during his opening statement, including that Rodriguez had an alibi and "was not at the scene" of the crime, that Rodriguez "had a pretty difficult life," and that he had a felony burglary conviction from when he was 18 years old. 2 VRP at 554. Counsel continued, "We're laying that out to you to let you know . . . [Rodriguez] wants to be as forthright as possible to you." *Id.* at 555. Counsel also told the jury that Rodriguez's DNA was on the air pistol found in Matheson's yard but insisted that Rodriguez had "nothing to hide . . . because that air pistol was stolen." *Id.* at 556. Counsel told the jury, "[W]hen I bring Ryan Rodriguez up to the stand and ask him, there's going to be a very important name called Dakota [Peak]." *Id.* at 559. Rodriguez "is going to tell you he's almost a hundred -- not 99 percent sure, a hundred percent sure that the guy who did it is Dakota [Peak]. . . . [H]e knows because Dakota [Peak] left his shoes at their house when . . . [Rodriguez's] equipment as a general contractor, pressure washer -- everything was stolen." *Id.*

6

The State later moved to preclude other suspect evidence. The trial court ruled that Rodriguez could not argue Peak was responsible for the burglary at Matheson's house but could present evidence suggesting Peak may have stolen Rodriguez's tools and air pistol. Rodriguez's counsel confirmed that he only wanted to introduce evidence suggesting Peak stole Rodriguez's air pistol and agreed that arguing Peak was involved in the robbery would be "crossing the line." 3 VRP at 1058.

B.      State's Case-in-Chief

1.      Fischer's testimony

Fischer testified for the State and told the jury that he was friends with Minkler and had occasionally lived with him. Fischer met Rodriguez in September or October 2019 through Minkler, who would occasionally help Rodriguez with work. Fischer's former girlfriend confirmed these connections.

On November 12, 2019, Fischer said he met Minkler and Rodriguez at a Denny's because "[s]omebody had stolen something from them and [they] were trying to get it back." 2 VRP at 941. He testified that someone named Dakota Peak had stolen tools from Rodriguez, and maybe Minkler, a week or two prior. The group did not find Peak, but Rodriguez knew "somebody who had tools that [they] could go to take." *Id.* at 943-44. Fischer and Minkler agreed to help steal the tools.

Fischer recalled that the three men dropped Rodriguez's truck off with Rodriguez's girlfriend and all got into Fischer's father's truck. They then went to Home Depot, where Minkler purchased rope and black gloves, "[i]n case [they] had to subdue [Matheson]." *Id.* at 951-52. The gloves were "[f]or fingerprint purposes." *Id.* at 954. Rodriguez brought an air pistol that looked like a real firearm. The three men drove from Home Depot to Matheson's house. They walked up

the driveway, and Rodriguez "loosened up the motion detector lights so they wouldn't turn on." *Id.* at 958.

After the front door did not open, Fischer opened the window and pulled Matheson's computer and camera out. He was planning to go through the window himself to unlock the front door. But Matheson came outside and started yelling. Rodriguez pointed the air pistol at Matheson, and Fischer came around the house and pushed Matheson down and started kicking him, "trying to knock him out." *Id.* at 959. Minkler "helped hold him down for a short while." *Id.* at 964. Fischer then hit Matheson with a flashlight, grabbed the computer, and ran. They escaped in the truck.

After Matheson shot the front of the truck, it began overheating, so the three men stopped at the Fern Prairie Market gas station. Fischer's then-girlfriend came to pick them up from some bushes where they hid nearby. When she testified, she confirmed that she picked up Fischer, Minkler, and "another individual" whom she "believe[d] to be [Rodriguez]." 3 VRP at 1092, 1094. But she was only sure that this third individual had "dark hair." *Id.* at 1094.

Fischer had three prior convictions for third degree theft from 2018, as well as a conviction for making a false statement. He testified that the thefts were related to his drug use, but he was no longer using drugs at the time of this trial.

2. Questions about drug use

Rodriguez's counsel asked Fischer whether Minkler and Fischer would "do drugs together." *Id.* at 1019. Minkler objected before Fischer responded, citing ER 404(b), and the objection was sustained. Counsel then asked Fischer about selling parts from Matheson's computer, saying, "Do you know with drug addicts if they have to get their fix, do -- do some people have to get any kind of money to get their fix?" *Id.* at 1024. Again, the trial court sustained an objection before Fischer could respond.

On cross-examination, Rodriguez's counsel asked Fischer's former girlfriend whether she saw "any signs" that "any of the other people in the car were drunk or on drugs" when she picked them up. *Id.* at 1111. She responded, "Honestly, I just figured that they were all on drugs because I --." *Id.* Minkler objected, and the trial court sustained the objection and instructed the jury to disregard the last question and comment.

Rodriguez's counsel also asked Fischer why he was testifying, saying, "Why have you decided to sit here and come here instead of having a lawyer, like . . . you know, Mr. Minkler?" *Id.* at 1026. Counsel then clarified, "I mean do you know -- why are you doing this? Why are you testifying against Mr. Minkler and Mr. Rodriguez, my Client?" *Id.* at 1027. Fischer answered that he was testifying against them to get a lesser sentence.

3.      Matheson's suspicions

Matheson told the jury, "I can't say who was involved." 2 VRP at 619. "I never saw anyone's face." *Id.* at 626. He also could not recognize any of the voices.

On cross-examination, Rodriguez's counsel asked Matheson to "guess" whether Rodriguez was one of the perpetrators. *Id.* at 638. Matheson responded that he thought Rodriguez was involved because Rodriguez was one of the only people who had been to Matheson's house in recent years and he thought Rodriguez had opened the window by his computer while he was there. Rodriguez's counsel then had the following exchange with Matheson:

> Q: Have you heard whether or not [Rodriguez] was involved in this incident on November 12th from anybody?
>
> A: No, I just did my own Google searches and kind of put it together as much that I could.
>
> Q: How -- can you explain to the jury, what do you mean -- put it together?
>
> A: I [G]oogled his name and found out he had done something similar as a younger person.

Q: Like what?

A: He had stolen stuff from a project he was working on and burned down the place.

Q: What -- can you prove that or you just read something somewhere?

A: He was convicted, I believe. It was in The Columbian [a local newspaper].

. . . .

A: I read that article, yeah, that he had stolen from a place he was working at -- stole tools and then burned the place down.

Q: So would you think that would be -- in your opinion, would you think that that would be -- it would be natural to think that you can speculate that he's the one that did that?

[THE STATE]: Objection -- relevance.

THE COURT: It calls for speculation -- sustained.

*Id.* at 639-40. The trial court did not ask the jury to disregard this exchange.

Rodriguez's counsel later asked Matheson, "What is your main reason why you think that [Rodriguez] did this?" *Id.* at 648-49. Matheson responded,

Because I'm an isolated person, no one comes to my house. I have a gate. I finally let someone come to my house and then I ask him if he wants to paint and he says he needs a lot—he needs money, he has a baby coming and then I don't hear from him again. And I tell him after I told him I have the money for your paint job and I don't hear from him again? And he's asking me about security lights and I said I don't—I want ornamental lights and he's asking me about security lights again. And then all of a sudden the window that was opened when he was pressure washing is the window that they opened and stole my stuff out of.

*Id.* at 649.

Counsel continued to ask Matheson about his suspicions regarding Rodriguez, despite numerous objections that these questions had been asked and answered. He also returned to the news article about Rodriguez's prior burglary conviction and invited Matheson to reiterate that the prior burglary "was a big deal. . . . [Rodriguez] was working on a project, he went back and stole

10

a bunch of tools and then burned the place down." *Id.* at 670. Matheson recalled his feeling that "this is a guy who did this -- basically the same thing [to me] without burning down the house." *Id.* at 671.

Rodriguez's counsel also asked Matheson whether he recognized anybody else in the courtroom, and Matheson said he recognized Minkler from a report about the county's jail population.[1] Minkler objected, the objection was sustained, and the jury was instructed to disregard that response. Matheson then testified, without objection, that he discovered a business connection between Rodriguez and Minkler through Google. But when he mentioned an association through Facebook, Minkler objected, and the trial court sustained the objection.

4.      DNA evidence

A forensic scientist testified that a mixture of DNA "consistent with DNA originating from three different individuals" was on the air pistol found in Matheson's front yard and that there was "very strong support for the inclusion of Ryan Rodriguez as a possible contributor to this DNA profile." *Id.* at 795. "Assuming three contributors, it is 7.3 quintillion[2] times more likely to observe this DNA profile if it originated from Ryan Rodriguez and two unknown individuals than if it originated from three unrelated individuals selected at random from the U.S. population." *Id*. The forensic scientist clarified that this statistic "does not have anything to do with how much DNA was on the item or when the DNA was deposited on an item." *Id.* at 821. Minkler and Fischer were excluded as contributors.

5.      Rodriguez's note to Minkler

---

[1] The Skamania County Sheriff posts information on the local corrections facility's population, including individuals' names and charges. *See* http://skamaniasheriff.com/daily-population/.

[2] Seven and three tenths quintillion is 7,300,000,000,000,000,000.

Detective Schultz testified about the investigation and described a note he received from a corrections officer at the Skamania County Jail that "Rodriguez attempted to pass to someone named Milo." 3 VRP at 1219-20. The note was discovered during a search of Rodriguez's cell "within Mr. Rodriguez's personal property." *Id.* at 1224. Rodriguez had previously referred to Minkler as Milo.

The note said, "Milo -- since they saw three people get out of the truck, I'm blaming Dakota Peak. I know that you're saying you got picked up by them, but tell your lawyer the third person was Dakota Peak. That will help cut down his credibility. Talk soon. Hopefully we can BBQ soon." *Id.* at 1233; Exs. 26, 137.

Rodriguez's counsel objected when the State moved to admit this note, arguing in part— without providing any evidentiary support—that the note was taken from Rodriguez's legal mail. Rodriguez's counsel received a copy before trial, but he was surprised the State sought to admit it because he assumed it would "absolutely not with an exclamation" be admitted. *Id.* at 1227.

The trial court ruled the State had provided sufficient authentication and the note was relevant. Rodriguez's counsel continued to object, claiming Rodriguez's privacy rights had been violated and corrections staff did not have a right to view his legal mail. The trial court responded that counsel should have brought a pretrial motion to exclude the note on that basis, and it refused to hold a CrR 3.6 hearing during the trial. On cross-examination, Rodriguez confirmed the note was intended for Minkler. Rodriguez did not present any evidence to establish the note was part of his legal mail.

After the State rested, Minkler chose not to testify.

C.     Rodriguez's Case

    1.    Character evidence

Rodriguez testified in his own defense. His counsel began by eliciting information about Rodriguez's childhood, including that his father was deported when he was five years old and that he had a strained relationship with his mother. The trial court sustained numerous objections based on relevance. Counsel also elicited Rodriguez's criminal history, including that he had a burglary conviction and an arson conviction from when he was 18 years old. Rodriguez testified that he felt badly about his previous actions and that they occurred when he was hanging out with people who were not "good for [his] health." 4 VRP at 1543. He explained that he was "a kid," "pretty dumb," and lacked "any kind of support . . . [or] role models." *Id.* at 1550. At the time of the prior offenses, he was homeless and still attending his senior year of high school Numerous objections for relevance were again sustained when counsel sought to elicit that Rodriguez had not gotten into trouble since the burglary and arson convictions and that he was released from prison early on "good time." *Id.* at 1552. The trial court then asked the jury to step out and told Rodriguez's counsel:

> THE COURT: This has probably been the worst line of questioning that I have ever heard in my life, that has been the most improper line of questioning that I've heard in the years that I've been on the bench -- in the years that I've practiced as an attorney. Where are we going with this?
>
> MR. RO: We're opening our own door. We are actually stipulating to his criminal history.
>
> THE COURT: Right, you opened up a door that I closed for you with regards to his conviction for an Arson.
>
> MR. RO: Right, I understand.
>
> THE COURT: You opened the door and you allowed that. But the other question with regards to whether or not he's been in trouble at any other point in time along the line is improper character evidence and we've went down that road repeatedly.

*Id.* at 1554. Counsel argued that because he opened the door to Rodriguez's criminal history, Rodriguez should have "the full right" to "talk about [his] life." *Id.* at 1555. The trial court explained, "[The State] has objected to it because it is improper character evidence. So I have to repeatedly after every single question sustain his objection because it's improper." *Id.* at 1556. It continued, "[I]t's very detrimental to these jurors who are trying to sit here and listen to this evidence and this testimony coming in and all we have had is a long laundry list of inadmissible evidence." *Id.* The trial court asked, "Do you understand the Rules of Evidence, Mr. Ro?" *Id.* at 1556-57.

2. <u>Alibi defense</u>

After the jury was brought back in, Rodriguez testified that he had bought an air pistol at Walmart. He confirmed that the gun found on Matheson's lawn belonged to him but said the last time he saw it was in October 2019. He testified that it was stolen along with his tools and that after the theft, he found grey slippers he recognized as belonging to Peak on the ground. Rodriguez said that his log book, which contained Matheson's address, was also stolen. Rodriguez said he reported the theft to police, but law enforcement did not find any record of a report,

Rodriguez agreed his DNA would be on the gun because it was his gun. But he told the jury he was home playing video games on the night of November 12, 2019. Rodriguez denied ever pointing a gun at Matheson or seeing Matheson again after pressure washing his house. He also denied ever opening a window while pressure washing the house. He explained that opening a window during a pressure washing job would be "a liability issue" and that he has a form for clients to sign "making sure that screens are off and all windows are locked and closed and secured" so that nothing inside gets wet. *Id.* at 1618-19. He also denied ever meeting Fischer.

Counsel asked Rodriguez, "Okay. Now I want to ask you -- you heard here during the testimony that [Minkler's counsel] had said my Client wishes to not testify. Did you hear that?" *Id.* at 1602. Minkler objected "as far as wherever this is going," but the trial court overruled the objection. *Id.* Rodriguez's counsel then asked Rodriguez, "Why are you testifying?" *Id.* at 1603. Rodriguez responded, "Because I've got nothing to hide." *Id.* The State objected, and the trial court sustained this objection.

Rodriguez's girlfriend testified and corroborated Rodriguez's testimony that his toolboxes and air pistol were stolen and that Peak had come over to work on Rodriguez's truck the day of the theft. She testified that two officers from the Vancouver Police Department came out and took a report after the theft.

She also testified that on the night of November 12, 2019, she was at home with several family members, her roommate, and Rodriguez. They were "hanging out" and "playing video games." 3 VRP at 1303. Her family arrived around 4:00 p.m. and they "hung out that day until about like 9:00." *Id.* at 1321. "After 9:00, my family went home and me and [Rodriguez] laid down in bed. We just went to sleep." *Id.* She testified that Rodriguez was not absent that night and that it would have been "out of character" for him to get up and leave at night. *Id.* at 1322-23. She also would have heard his truck start and their dog would have barked. One of their roommates similarly testified that she knew Rodriguez was home on the night of November 12 and still home when she went to bed around 10:00 p.m. "because [her] dog didn't bark -- [she] didn't hear his car -- his truck start up." *Id.* at 1371. On cross-examination, Rodriguez's girlfriend admitted she could not remember what happened on November 10, 11, or 13 and had no documentation to prove what happened on November 12. But on recross she told the jury, "I am a hundred percent sure that I was with Ryan Rodriguez on the night of November the 12th, 2019." *Id.* at 1362.

15

Rodriguez's girlfriend's mother also testified that November 12, 2019 "would have been - - a typical day" where she saw her children and Rodriguez. *Id.* at 1420. She recalled that her family spent all that day together, as they did every day. She remembered they made Hamburger Helper and broccoli for dinner, and Rodriguez played video games with her younger children. She testified that Rodriguez never left the house that day. She knew he was there because they "were together every day, literally. There was not one day that [they] spent apart." *Id.* at 1444. "[H]e only left to go to work," and when he did, typically someone from the family would go with him. *Id.* at 1452.

Rodriguez's counsel repeatedly asked Rodriguez's girlfriend and her mother about his character. But the trial court sustained objections each time.

## V. JURY INSTRUCTIONS

The trial court instructed the jury, "The evidence that you are to consider during your deliberations consists of the testimony that you have heard from witnesses and the Exhibits that I have admitted." 4 VRP at 1651. "[T]he lawyers' statements are not evidence," and the jury "must disregard any remark, statement, or argument that is not supported by the evidence or the law in [the court's] Instructions." *Id.* at 1652.

The trial court instructed that the State "has the burden of proving each element of each crime beyond a reasonable doubt. The Defendant has no burden of proving that a reasonable doubt exists. A Defendant is presumed innocent." *Id.* at 1654. "A Defendant is not required to testify. You may not use the fact that a Defendant has not testified to infer guilt or to prejudice him in any way." *Id.* at 1655.

The court further instructed the jury, "You may consider evidence that a Defendant has been convicted of a crime only in deciding what weight or credibility to give that Defendant's

testimony. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation." *Id.* at 1656.

The court gave an instruction on accomplice liability. Then it instructed that to convict a defendant of first degree robbery, the fifth element they had to find was that "in the commission of these acts or in immediate flight therefrom," the defendant was either (a) "armed with a deadly weapon; or (b) . . . displayed what appeared to be a firearm or other deadly weapon; or (c) . . . inflicted bodily injury." *Id.* at 1659. The jury was instructed to return a verdict of guilty if it found "any of the alternative elements" proved beyond a reasonable doubt. *Id.* "To return a verdict of guilty, the jury need not be unanimous as to which of the alternatives -- 5(a), 5(b), or 5(c) -- has been proved beyond a reasonable doubt, as long as each juror finds that at least one alternative has been proved beyond a reasonable doubt." *Id.*

To convict a defendant of second degree assault, the jury had to find that they "recklessly [inflicted] substantial bodily harm." *Id.* at 1662. "Substantial bodily harm means bodily injury that involves a temporary but substantial disfigurement or that causes a temporary but substantial loss or impairment of the function of any bodily part or organ or that causes a fracture of any bodily part." *Id.* at 1664.

### VI. CLOSING ARGUMENTS

In closing, the State highlighted the accomplice liability instruction and explained that it was "arguing these guys all worked together." *Id.* at 1671. The State acknowledged there was not "testimony that Minkler beat up Matheson or held the pistol to Matheson's face," but it argued Minkler was still an accomplice. *Id.* Summarizing the robbery instruction, the State argued that when you "beat [the owner of the property] up while you're taking the property, cause injuries to

them, point your weapon and threaten them, take the property, [and] get out of there -- that's a robbery." *Id.* at 1672-73.

Regarding Rodriguez, the State argued, "I'd like to talk about the alibi witnesses. No corroboration; no receipts; no logs; no tax info; no proof -- no proof." *Id.* at 1679. "It's pretty easy to say November 12th was like every other day because I do the same thing every other day. That's not an alibi. An alibi is I went to the grocery store, here's a receipt. I was at the grocery store when this happened." *Id.* "It's not an alibi to have people get up on the stand who care about you and love you -- get up there and say it was just like any night -- I'm with him every single night; he's never away from me; and this was just like every other night." *Id.* The State then argued Rodriguez's alibi witnesses were not credible.

In closing, Minkler emphasized the right to remain silent and to hold the State to its burden of proof. He then focused on attacking Fischer's credibility.

Rodriguez's counsel insisted that Rodriguez "wasn't there." *Id.* at 1700. He told the jury, "I am going to prove to you . . . I will bring forward the proof . . . [that Rodriguez] is not only not guilty, that he's innocent. I'm not going to right now just talk about beyond a reasonable doubt, the State hasn't proven their case -- we are going to prove to you what happened." *Id.* at 1700-01. He suggested the jury compare the State's evidence on one hand with the evidence Rodriguez presented on the other. "[T]he Prosecutor brought their case to you . . . . We brought our case to you." *Id.* at 1716.

In rebuttal, the State argued, "Now, [Rodriguez's counsel] said he was going to prove that his Client wasn't guilty -- he was going to prove in his closing arguments. Well, ask yourself -- did he prove anything in his closing arguments?" *Id.* at 1723. "He doesn't have a verifiable alibi." *Id.*

The jury found both defendants guilty of all charges. There were no special verdict forms.

VII. SENTENCING

The trial court found that Minkler's assault elevated the robbery charge to the first degree, and the assault and robbery involved the same criminal intent. The court stated it was "merging [Minkler's] same criminal conduct with regards to the robbery and the assault." *Id.* at 1755. Minkler's offender score included one point for a violation of the Uniform Controlled Substances Act, chapter 69.50 RCW. The trial court also decided to "make a finding he continues to be indigent and waive the other discretionary costs in this matter." *Id.* at 1758. But it imposed witness fees and mileage costs with monthly payments of $25. Minkler is not employed and receives $1,500 in disability payments each month.

When sentencing Rodriguez, the trial court stated, "Again, the Court does make a determination that the robbery and the assault does constitute the same criminal conduct." *Id.* at 1766. It added, "I'm going to make a finding you are indigent and . . . waive any other discretionary . . . costs in this matter." *Id.* at 1770. Then it imposed witness fees and mileage costs that would be joint and several with Minkler.

Both Minkler and Rodriguez appeal their convictions. Minkler also challenges his sentence.

ANALYSIS

I. INEFFECTIVE ASSISTANCE OF COUNSEL FOR RODRIGUEZ

Rodriguez argues his trial counsel committed numerous errors that deprived him of his constitutional right to the effective assistance of counsel. We agree.

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant the right to effective assistance of

counsel. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). "The right to counsel plays a crucial role in the adversarial system" because "access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Strickland v. Washington*, 466 U.S. 668, 685, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275, 63 S. Ct. 236, 87 L. Ed. 268 (1942)). To show that he received constitutionally inadequate representation, Rodriguez must show both that his counsel's performance was deficient and that the deficient performance prejudiced him. *Estes*, 188 Wn.2d at 457-58 (citing *Strickland*, 466 U.S. at 687). "The failure to show either deficient performance or prejudice defeats a defendant's claim." *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012). When reviewing a claim of ineffective assistance on direct appeal, we consider only the facts included in the trial record. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

A.      Counsel's Performance

"Performance is deficient if it falls 'below an objective standard of reasonableness based on . . . all the circumstances.'" *Estes*, 188 Wn.2d at 458 (quoting *McFarland*, 127 Wn.2d at 334-35). The defendant must show "'the absence of legitimate strategic or tactical reasons'" for counsel's conduct. *Emery*, 174 Wn.2d at 755 (quoting *McFarland*, 127 Wn.2d at 336).

1.      Opening statement

Rodriguez first argues his counsel was ineffective because counsel said in his opening statement that another person, Peak, was responsible for the crime, but he had no viable strategy for presenting evidence to support this theory.

A failure to deliver evidence that was promised to the jury during opening statements may constitute deficient performance, depending on the facts of the case. *See In re Pers. Restraint of*

*Benn*, 134 Wn.2d 868, 897-98, 952 P.2d 116 (1998). In his opening statement, Rodriguez's counsel admitted that Rodriguez's DNA was on the air pistol found in Matheson's yard but said that Rodriguez had "nothing to hide . . . because that air pistol was stolen." 2 VRP at 556. Counsel told the jury that Rodriguez would testify "he's almost a hundred -- not 99 percent sure, a hundred percent sure that the guy who did it is Dakota [Peak] . . . . [H]e knows because Dakota [Peak] left his shoes at their house when . . . [Rodriguez's] equipment as a general contractor, pressure washer -- everything was stolen." *Id.* at 559.

Rodriguez testified that he believed Peak stole his air pistol, and Rodriguez's girlfriend corroborated this testimony. Additionally, Fischer, the State's key witness, testified that he believed Peak had stolen from Rodriguez a few weeks prior to the robbery.

When he gave his opening statement and described Peak as "the guy who did it," counsel did not specify what "it" referred to, so the jury could have interpreted this statement as a promise that Rodriguez would testify he was 100 percent sure Peak robbed Matheson. *Id.* But after the State brought a motion to preclude testimony identifying Peak as another suspect, Rodriguez's counsel clarified that he only wanted to introduce evidence suggesting Peak stole Rodriguez's air pistol prior to the offenses. The trial court ruled that evidence admissible and counsel presented it.

Counsel's strategy for explaining the presence of Rodriguez's DNA on the air pistol was legitimate, and he successfully presented evidence to support this theory during trial. Counsel's single potentially misleading statement during opening did not constitute deficient performance.

2.    Testimony on Rodriguez's propensity to commit this crime

Rodriguez next argues his counsel performed deficiently when he engaged in a line of questioning with Matheson about Rodriguez's prior convictions for burglary and arson. This questioning was improper because it ignored the trial court's evidentiary ruling and because it encouraged Matheson to speculate at length on Rodriguez's propensity to commit the present crime. It "could serve no purpose other than to raise the inference that since Rodriguez had committed the prior offense, with some factual similarities to the charged incident, he must be guilty in this case as well." Br. of Appellant (Rodriguez) at 25-26. "None of that testimony was admissible under the rules of evidence, and there is no conceivable strategy in which its admission would benefit the defense." *Id.* at 27.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." ER 404(b). In general, a defendant's prior convictions are inadmissible because they are irrelevant to a determination of guilt and because they are highly prejudicial. *State v. Vazquez*, 198 Wn.2d 239, 252, 494 P.3d 424 (2021). They "'may lead the jury to believe the defendant has a propensity to commit crimes'" and shift the jury's focus away from the merits of the present charge. *Id.* (quoting *State v. Hardy*, 133 Wn.2d 701, 706, 946 P.2d 1175 (1997)). Studies have shown that if a jury learns of the defendant's prior conviction, they are more likely to convict. *See Hardy*, 133 Wn.2d at 710-11.

ER 609(a) is a narrow exception to the general rule excluding a defendant's prior convictions. *Vazquez*, 198 Wn.2d at 253. In part, it allows a prior conviction involving dishonesty to be admitted for the limited purpose of attacking a witness's credibility. ER 609(a)(2). A prior conviction for second degree burglary "is not a per se crime of dishonesty," but "[i]f the predicate crime was theft, a burglary conviction may be used as a crime of dishonesty under ER 609(a)(2)."

*State v. Garcia*, 179 Wn.2d 828, 847, 318 P.3d 266 (2014). ER 609(a) does not allow the burglary conviction to be admitted as propensity or character evidence, however. *See* ER 105 (explaining that evidence may be admissible for one purpose but not another).

Before trial began, the trial court ruled that Rodriguez's prior conviction for burglary would be admissible for impeachment purposes because the underlying intent was to commit a theft. But the trial court excluded the related arson conviction. Yet, when Rodriguez's counsel cross-examined Matheson, he elicited testimony that Matheson discovered Rodriguez "had done something similar [to the charged offense] as a younger person" where he "had stolen stuff from a project he was working on and burned down the place." 2 VRP at 639. In response to counsel's further questioning on this topic, Matheson repeated two more times that Rodriguez had previously stolen tools "and then burned the place down." *Id.* at 640, 670. Again in response to counsel's questioning, Matheson speculated that he believed Rodriguez had done "basically the same thing" in this case "without burning down the house." *Id.* at 671.

Matheson's speculation that Rodriguez robbed him because he had "done something similar" in the past and was now doing "basically the same thing" is exactly the type of inference that ER 404(b) prohibits. *Id.* at 639, 671. And Matheson's testimony far exceeded the limits of ER 609(a)(2). Counsel repeatedly encouraged Matheson, the victim of the present crime, to speculate that Rodriguez was guilty based on the similar nature of a past crime. Although Rodriguez's counsel argued, and the State now repeats, that this was part of an attempt to be transparent with the jury, it was not a legitimate strategic decision, particularly where the underlying details of the incident and the arson conviction were excluded pretrial. Inviting the victim to repeatedly discuss inadmissible evidence of Rodriguez's prior arson conviction, and to discuss his burglary

23

conviction as a reason for suspecting him of the current charges, could only harm Rodriguez. Counsel's performance was deficient in this regard.

3.    Jailhouse letter

Rodriguez argues corrections officers gave his legal mail to the State, so counsel should have filed a CrR 8.3(b) motion to dismiss due to governmental misconduct or, alternatively, a CrR 3.6 motion to suppress the wrongfully seized evidence. He argues "it is reasonably likely [the] court would have at the very least suppressed the document" if counsel had brought a pretrial motion. Br. of Appellant (Rodriguez) at 30. The State responds that Rodriguez's proposed pretrial motions would have failed because the note was between Rodriguez and his codefendant, not a privileged attorney-client communication.

The attorney-client privilege only applies to communications between an attorney and their client, and it exists so that "'clients will not hesitate to fully inform their attorneys of all relevant facts.'" *See State v. Irby*, 3 Wn. App. 2d 247, 254, 415 P.3d 611 (2018) (quoting *Barry v. USAA*, 98 Wn. App. 199, 204, 989 P.2d 1172 (1999)). Rodriguez fails to show that the note addressed to Milo was privileged. Detective Schultz testified that he received the note from a corrections officer, and the "note was located within Mr. Rodriguez's personal property" in his cell. 3 VRP at 1224. The only person who described it as confidential legal mail was Rodriguez's counsel, who did not present any evidence to support this contention. *See McFarland*, 127 Wn.2d at 335 (limiting our review on direct appeal to the facts included in the trial record). Rodriguez confirmed on cross-examination that the note was intended for Minkler, not his attorney.

Rodriguez's counsel did object to the admission of this note on other bases, including that it was misleading and lacked the necessary foundation because Rodriguez's name was not on it. We cannot conclude counsel was deficient for failing to move to suppress the note based on a

wrongful seizure of attorney-client communication where the record does not show that the note was an attorney-client communication.

    4.    <u>Closing</u>

Finally, Rodriguez argues his counsel was ineffective for failing to object when the prosecutor misstated the law regarding alibi defenses during closing argument and told the jury that corroborating evidence was required. The prosecutor's argument improperly placed the burden of proof on the defendant. Rodriguez argues there is no legitimate tactical reason for not objecting to this burden shifting.

"An alibi defense denies that the defendant committed the crime," negating an element of the crime that the State must prove. *State v. Riker*, 123 Wn.2d 351, 367, 869 P.2d 43 (1994). Therefore, to succeed on an alibi defense, the defendant need only "present sufficient evidence to create a reasonable doubt as to [their] guilt." *See State v. W.R.*, 181 Wn.2d 757, 762, 336 P.3d 1134 (2014). Rodriguez did not have the burden of proving his alibi. *See id.*

Prosecutors may argue about witness credibility, but they may not shift the burden of proof to the defendant. *State v. Miles*, 139 Wn. App. 879, 890, 162 P.3d 1169 (2007). Yet "'[o]nly in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal.'" *State v. Johnston*, 143 Wn. App. 1, 19, 177 P.3d 1127 (2007) (quoting *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989)).

In its closing argument, the State emphasized that Rodriguez presented "[n]o corroboration; no receipts; no logs; no tax info; no proof -- no proof" to support his alibi defense. 4 VRP at 1679. The State argued that testimony essentially stating, "I do the same thing every other day" is "not an alibi" because an alibi requires something more concrete, like a receipt. *Id.* "It's not an alibi to have people get up on the stand who care about you and love you -- get up

25

there and say it was just like any night -- I'm with him every single night; he's never away from me; and this was just like every other night." *Id.*

Although the State can point out the lack of support for a defense theory, suggesting to the jury that Rodriguez had a burden to prove his alibi and corroborate his witnesses by affirmatively providing objective evidence was a misstatement of the law. *See W.R.*, 181 Wn.2d at 762. Rodriguez's counsel was deficient for failing to object. Counsel performed deficiently when he failed to object.[3]

B.      Prejudice

Prejudice occurs where "there is a reasonable probability that 'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Estes*, 188 Wn.2d at 458 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). A reasonable probability is one that undermines confidence in the outcome. *Id.* The "guiding principle in our analysis" is whether the proceeding was fundamentally fair. *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. When making this determination, we consider the totality of the evidence presented. *Id.* at 695. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

---

[3] Rodriguez also argues counsel performed deficiently because counsel repeatedly sought to introduce inadmissible character evidence when questioning him, resulting in multiple sustained objections. Eventually, counsel's questioning prompted the trial court to excuse the jury and inform counsel he had just engaged in "the most improper line of questioning" the court had ever heard. 4 VRP at 1554. Counsel also sought to elicit character evidence from Rodriguez's girlfriend and her mother, and the trial court again sustained repeated objections. We need not further address this claim, however, because other instances of counsel's deficiency were prejudicial and warrant a new trial, as discussed below.

Here, counsel performed deficiently when he repeatedly elicited Matheson's testimony speculating that Rodriguez was guilty of the current charges because he had committed similar crimes in the past. In addition, counsel failed to object to the State's misstatement of the law with regard to the burden of proof for Rodriguez's alibi defense.

The State presented some compelling evidence. Rodriguez was the only one who had prior contact with Matheson at his remote and secluded property, where Matheson rarely had visitors. Rodriguez was familiar with Matheson's windows and lights. Rodriguez's DNA was found on the air pistol used to threaten Matheson. Although Rodriguez presented evidence that Peak had stolen this pistol, the jury also saw a note where Rodriguez appeared to be asking Minkler to falsely identify Peak as the third person involved. And Fischer testified in great detail about what occurred on the night of the offense, and his testimony was clear that Rodriguez was involved.

However, the evidence could have supported Rodriguez's alibi defense. Matheson testified that he could not say for sure who was involved in robbing and assaulting him. He told the jury, "I never saw anyone's face," and he could not recognize any voices. 2 VRP at 626. Rodriguez was not visible in the security footage from Fern Prairie Market on the night of the offense. When Fischer's former girlfriend picked up Fischer and Minkler from Fern Prairie, she believed that the third person she picked up was Rodriguez, but she could only be sure that the person had dark hair. The only witness who could definitively place Rodriguez at Matheson's house on the night of the offense was Fischer, who was testifying in order to receive a lesser sentence and who had prior convictions for theft and making a false statement.

Rodriguez, his girlfriend, and his girlfriend's mother all testified that Rodriguez had an alibi for the night of the offense—that he was at home, eating dinner and playing video games. Although Rodriguez's DNA was on the air pistol, multiple people, including one of the State's

27

own witnesses, testified that Rodriguez had items stolen from his truck in the weeks prior to the offense, including possibly his air pistol and a log of business contacts.

Rodriguez's counsel's deficiency was profound, and counsel's deficient performance prejudiced Rodriguez. Even though Matheson could not positively identify who was involved in the crime, Rodriguez's counsel invited him to "guess" whether Rodriguez was involved, to testify at length about the nature of Rodriguez's prior crimes, and to give reasons why he believed that Rodriguez was responsible for this crime. But for counsel's deficient performance during this questioning, the jury would have known only that Rodriguez was previously convicted of burglary. It would not have known that the details of that offense mirrored some details of the present charge, that Rodriguez was also convicted of arson, or that the victim of this crime had reasons to believe Rodriguez was guilty. Although the jury was instructed to use the fact of Rodriguez's prior conviction for a limited purpose, it is doubtful that this instruction was sufficient to cure the prejudice wrought by such a lengthy and detailed line of speculative questioning.

Moreover, counsel failed to object to the State's misstatement during closing argument stating Rodriguez had to prove his innocence with objective evidence of his whereabouts that night that was more than just family members' testimony.

Counsel's deficiencies were profound, and they undermine confidence in the verdict. Had counsel performed effectively, there is a reasonable probability that the outcome would have been different. We conclude that ineffective assistance requires reversal and Rodriguez is entitled to a new trial.

## II. MINKLER'S RIGHT TO A FAIR TRIAL

Minkler argues Rodriguez's counsel's acts accumulated to deny him a fair trial: counsel for Rodriguez "continually violated the rules of evidence," raised topics that were "inadmissible and unfairly prejudicial to Minkler," and "pointedly commented on Minkler's right to remain silent to . . . malign Minkler." Br. of Appellant (Minkler) at 15. We disagree.

"The right to a fair trial is a fundamental liberty secured by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution." *State v. Hecht*, 179 Wn. App. 497, 503, 319 P.3d 836 (2014). "A defendant is entitled to a fair trial but not a perfect one." *State v. Lazcano*, 188 Wn. App. 338, 370, 354 P.3d 233 (2015). They must prove "an accumulation of error of sufficient magnitude to warrant a new trial." *Id.* Minkler fails to meet this burden.

A.      Comment on Minkler's Decision Not to Testify

Minkler argues Rodriguez's counsel violated his right to a fair trial when he commented twice on Minkler's decision not to testify and then "impermissibly directed the jury to conclude Minkler and not Rodriguez was the guilty party." Br. of Appellant (Minkler) at 19.

A comment on a defendant's failure to testify by their codefendant's counsel may, under certain circumstances, deprive the defendant of a fair trial. *State v. Dickerson*, 69 Wn. App. 744, 747, 850 P.2d 1366 (1993). Minkler must show both that Rodriguez's counsel's comments were improper and that he was prejudiced by the comments. *Id.*

Rodriguez asked Fischer, "Why have you decided to sit here and come here instead of having a lawyer, like . . . Mr. Minkler?" 3 VRP at 1026. This question was not a comment on Minkler's decision not to testify. When considered in the context of counsel's line of questioning, it is clear that Rodriguez's counsel was attempting to ask Fischer why he decided to testify against

Minkler and Rodriguez instead of relying on a lawyer to defend him. *See id.* at 1027 ("I mean . . . [w]hy are you testifying against Mr. Minkler and Mr. Rodriguez[?]"). Fischer responded that he would get a lesser sentence in exchange for his testimony. This attempt to undermine Fischer's credibility was not improper and likely benefitted Minkler.

Later, counsel asked Rodriguez, "Now I want to ask you -- you heard here during the testimony that [Minkler's counsel] had said my Client wishes to not testify . . . . Why are you testifying?" 4 VRP at 1602-03. Rodriguez responded, "Because I've got nothing to hide." *Id.* at 1603. The trial court sustained an objection.

Commenting on Minkler's decision not to testify, even indirectly, was improper, but this single comment was unlikely to influence the jury's verdict. Both Minkler and the State objected during this line of questioning, and the trial court sustained an objection. The jury was also specifically instructed, "A Defendant is not required to testify. You may not use the fact that a Defendant has not testified to infer guilt or to prejudice him in any way." *Id.* at 1655. And Minkler emphasized during closing argument that he had a right to remain silent and to hold the State to its burden of proof. Considering this one statement in the context of the entire case, Minkler fails to show prejudice.

B.     Questions about Minkler's Drug Use

Minkler next argues Rodriguez's counsel "jeopardized [his] right to a fair trial by bringing in irrelevant, highly prejudicial information," including evidence of his drug use. Br. of Appellant (Minkler) at 23. "The court sustained the objections but did not tell the jury to disregard the questions and elicited answers." *Id.*

"'Evidence of drug use on other occasions . . . is generally inadmissible on the ground that it is impermissibly prejudicial.'" *State v. Stockton*, 91 Wn. App. 35, 42, 955 P.2d 805 (1998)

30

(alteration in original) (quoting *State v. Tigano*, 63 Wn. App. 336, 344-45, 818 P.2d 1369 (1991)). Where there is no motion to strike or instruction to disregard the testimony after an objection is sustained, that testimony "remains part of the record for the jury to consider." *State v. Fluker*, 5 Wn. App. 2d 374, 396, 425 P.3d 903 (2018). But a lawyer's questions are not part of the evidence.

Rodriguez's counsel asked Fischer whether he and Minkler would "do drugs together." 3 VRP at 1019. The trial court sustained an objection before Fischer could respond. Counsel also questioned Fischer about selling parts from Matheson's computer. In the context of this line of questioning, he asked, "Do you know with drug addicts if they have to get their fix, do -- do some people have to get any kind of money to get their fix?" *Id.* at 1024. Again, the trial court sustained an objection before Fischer could respond. And when cross-examining Fischer's former girlfriend, counsel asked whether she noticed "any signs" that the men she picked up from the Fern Prairie Market were drunk or on drugs. *Id.* at 1111. The witness began to respond before the trial court sustained an objection, but the court instructed the jury to disregard the question and comment.

Ultimately, no testimony regarding Minkler's drug use entered the record for the jury to consider. And the jury was instructed that "the lawyers' statements are not evidence." 4 VRP at 1652. Thus, counsel's questions on this subject did not deprive Minkler of a fair trial.

C.     Social Media Connections

Minkler argues Rodriguez's counsel prejudiced him when he violated the court's pretrial ruling and introduced evidence of an association between Minkler and Rodriguez without foundation.

Before trial, the trial court excluded "any reference that [Matheson] looked at social media and determined that [Minkler and Rodriguez] were associated together." 1 VRP at 289. When Rodriguez's counsel asked Matheson about connecting Rodriguez and Minkler through Facebook,

the trial court sustained Minkler's objection. However, Matheson was able to testify that he discovered Rodriguez and Minkler had a business connection through Google. And other witnesses also testified that Rodriguez and Minkler had previously worked together and spent time together. Given the other evidence demonstrating a prior association between Rodriguez and Minkler, it is unclear how evidence about their association through Facebook would have affected the outcome of the proceedings. We conclude Minkler was not deprived of a fair trial.

### III. MINKLER'S SENTENCE

A.      Double Jeopardy

Minkler argues his conviction for second degree assault violates double jeopardy and must be vacated because it merged with his conviction for first degree robbery. The State concedes that Minkler's case "should be remanded for resentencing in conformity with a finding that his second-degree assault conviction should merge with his robbery conviction." Br. of Resp't at 73. When sentencing Minkler, the trial court stated it was "merging [Minkler's] same criminal conduct with regards to the robbery and the assault." 4 VRP at 1755. We accept the State's concession and remand.

A double jeopardy analysis is distinct from a "'same criminal conduct'" analysis. *State v. French*, 157 Wn.2d 593, 611, 141 P.3d 54 (2006). Both the United States and Washington Constitutions protect criminal defendants from being put in jeopardy twice for "'the same offense.'" *State v. Kelley*, 168 Wn.2d 72, 76, 226 P.3d 773 (2010) (quoting U.S. CONST. amend. V; WASH. CONST. art. I, § 9). A double jeopardy analysis accordingly considers whether multiple convictions may stand under the constitution. *See French*, 157 Wn.2d at 612. In contrast, a "same criminal conduct" determination impacts the defendant's offender score and whether sentences for multiple convictions must be served concurrently. RCW 9.94A.589(1)(a). Here, the trial court

mentioned both same criminal conduct and merger, but it did not vacate Minkler's assault conviction and merge it with his robbery conviction. When considering a double jeopardy claim, "[o]ur review is de novo, and legislative intent is the touchstone." *State v. Kier*, 164 Wn.2d 798, 804, 194 P.3d 212 (2008).

"'Under the merger doctrine, when the degree of one offense is raised by conduct separately criminalized by the legislature, we presume the legislature intended to punish both offenses through a greater sentence for the greater crime.'" *State v. Arndt*, 194 Wn.2d 784, 819, 453 P.3d 696 (2019) (quoting *State v. Freeman*, 153 Wn.2d 765, 772-73, 108 P.3d 753 (2005)). The Supreme Court has explained that second degree assault and first degree robbery convictions will often merge because "[u]sing force to intimidate a victim into yielding property is often incidental to the robbery." *Freeman*, 153 Wn.2d at 779.

To determine whether a specific defendant's convictions for second degree assault and first degree robbery merge, however, we engage in a case-by-case analysis. *Id.* at 780. We must ask whether, "[a]s charged and proved, without the conduct amounting to assault, [the defendant] would be guilty of only second degree robbery." *Id.* at 778. We consider "the entire trial record, particularly the evidence presented . . . , closing arguments, and the jury instructions." *In re Pers. Restraint of Knight*, 196 Wn.2d 330, 342, 473 P.3d 663 (2020) (emphasis omitted). We must determine what the State proved beyond a reasonable doubt. *See Freeman*, 153 Wn.2d at 779 (rejecting the State's argument that the assault had an independent purpose and effect where such a purpose and effect "was not found by the jury"); *State v. Esparza*, 135 Wn. App. 54, 64, 143 P.3d 612 (2006) (looking to the trial court's findings of fact to show what the State proved at trial). The State may elect "the particular acts on which charges are based" during closing argument so long as it is done clearly. *Knight*, 196 Wn.2d at 340.

If the basis for the jury's verdict is unclear or ambiguous, the rule of lenity applies, and the defendant's convictions merge. *Kier*, 164 Wn.2d at 814. In *Kier*, for example, the State argued the defendant's separate convictions for first degree robbery and second degree assault arising out of a carjacking did not violate double jeopardy because each offense was committed against a separate victim—the robbery against the car's driver and the assault against the car's passenger. *Id.* at 808. Although the jury's instructions identified the car's passenger as the victim of the assault, the instructions did not identify a specific victim of the robbery, and the jury heard evidence describing both the driver and the passenger as victims of the robbery. *Id.* at 812. Because the jury could have found the car's passenger to be a victim of the robbery in addition to the assault, it was "unclear from the jury's verdict whether the assault was used to elevate the robbery to first degree." *Id.* at 813. The basis for the jury's verdict was ambiguous, so the rule of lenity required that the convictions merge. *Id.* at 814; *see also State v. Deryke*, 110 Wn. App. 815, 824, 41 P.3d 1225 (2002) (holding that where "neither the jury instructions nor the verdict form required the jury to specify which act it chose to reach its verdict" on the elevated charge, we must "assume the jury based its verdict on" the act that was separately criminalized).

Here, the jury found Minkler was guilty of second degree assault beyond a reasonable doubt because he or an accomplice inflicted bodily injury. But the basis for the jury's first degree robbery verdict is ambiguous. The jury was instructed that to find Minkler guilty of first degree robbery, it had to find he or an accomplice was either (a) "armed with a deadly weapon; *or* (b) . . . displayed what appeared to be a firearm or other deadly weapon; *or* (c) . . . inflicted bodily injury." 4 VRP at 1659 (emphasis added). The jury was told it did not need to unanimously agree on which alternative the State proved beyond a reasonable doubt, and there were no special verdict forms. In closing, the State relied on multiple means, arguing if you "beat [the owner of the

34

property] up while you're taking the property, cause injuries to them, point your weapon and threaten them, take the property, get out of there -- that's a robbery." *Id.* at 1672-73.

Considering the evidence presented, jury instructions, and closing argument, the jury could have based its verdict on either a defendant's display of what appeared to be a deadly weapon or the infliction of bodily injury. The rule of lenity requires us to interpret the ambiguous verdict in favor of Minkler and conclude that the jury based its verdict on the infliction of bodily injury. We accept the State's concession and remand for the trial court to merge Minkler's conviction for second degree assault with his conviction for first degree robbery and resentence him.

B.      Offender Score

Minkler argues, and the State concedes, that his offender score must be corrected in light of the Supreme Court's decision in *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021), which invalidated the statute criminalizing simple drug possession. A conviction that is "constitutionally invalid" cannot be included in an offender score. *State v. Jennings*, 199 Wn.2d 53, 67, 502 P.3d 1255 (2022). Because a prior conviction for drug possession was considered when calculating Minkler's offender score, we accept the State's concession and direct the trial court to correct Minkler's offender score on remand.

C.      Discretionary Legal Financial Obligations

Finally, Minkler argues his counsel was ineffective for failing to challenge the trial court's imposition of witness fees and mileage costs after the court found Minkler indigent and waived discretionary costs. Witness costs are discretionary assessments. *State v. Clark*, 191 Wn. App. 369, 374, 362 P.3d 309 (2015). "The court shall not order a defendant to pay costs if the defendant at the time of sentencing is indigent." RCW 10.01.160(3). Costs under RCW 10.01.160 include

"expenses specially incurred by the state in prosecuting the defendant." RCW 10.01.160(2). The trial court must strike these costs on remand.

## CONCLUSION

We reverse Rodriguez's convictions and remand for a new trial, and we affirm Minkler's convictions but remand for Minkler to be resentenced with a corrected offender score. On remand, the trial court will merge Minkler's assault conviction and strike the witness fees and mileage costs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Worswick, J.

Maxa, J.